UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

| | |
|---|---|
| CANAAN X L.P., CANAAN XI L.P., F-PRIME CAPITAL PARTNERS TECH FUND LP, GREATPOINT VENTURES INNOVATION FUND II, L.P., and MASSMUTUAL VENTURES US II LLC,<br><br>Plaintiffs,<br><br>v.<br><br>MONEYLION INC., DIWAKAR CHOUBEY, RICHARD CORREIA, JEFFREY GARY, CHRIS SUGDEN, DWIGHT BUSH, JOHN CHRYSTAL, LISA GERSH, MATT DERELLA, ANNETTE NAZARETH, and MICHAEL PAULL,<br><br>Defendants. | Civil Action No.: 23-cv-6550 |

## **COMPLAINT**

Plaintiffs Canaan X L.P., Canaan XI L.P., F-Prime Capital Partners Tech Fund LP, GreatPoint Ventures Innovation Fund II, L.P., and MassMutual Ventures US II LLC, (collectively, the "Investors") by and through their undersigned counsel, hereby bring this Complaint against MoneyLion Inc. ("MoneyLion"), its Chief Executive Officer ("CEO") Diwakar Choubey, its Chief Financial Officer ("CFO") Richard Correia, and the MoneyLion Board of Directors (the "Board" and, together with the CEO and CFO, the "Individual Defendants"), and allege as follows:

## INTRODUCTION

1.      This action is brought by certain holders of Series A Convertible Preferred Stock ("Plaintiffs" or the "Investors" and the "Series A Preferred Stock") of Defendant MoneyLion, Inc., seeking remedies for false statements in a March 31, 2023 Proxy Statement issued to MoneyLion's shareholders, and for faithless and careless conduct by MoneyLion's directors and officers through which Plaintiffs were stripped of important shareholder rights.

2.      On April 24, 2023, Defendant effected a 1-for-30 Reverse Stock Split (the "Reverse Stock Split") which purported to strip the holders of the Series A Preferred Stock, including the Investors, of their rights, preferences, and privileges under a Certificate of Designations of Series A Convertible Preferred Stock (the "Certificate").  The Reverse Stock Split was thus effected in a manner that deprived the Investors of their bargained-for rights under the Certificate and failed to appropriately disclose this reality to all shareholders.

3.      Among other things, the Defendants made false statements about the Reverse Stock Split in a Definitive Proxy Statement that MoneyLion filed with the Securities and Exchange Commission (the "SEC") on March 31, 2023 (the "Proxy Statement").  The Proxy Statement stated, for example, that the Reverse Stock Split was "not intended to modify the rights of existing stockholders in any material respect."  And yet, the Reverse Stock Split *did* strip the holders of Series A Preferred Stock of important rights. This statement in the Proxy Statement, and others, was untrue and, upon information

and belief, MoneyLion's officers and directors were among those responsible for the Proxy Statement containing false and misleading statements.

4.      Specifically, the Reverse Stock Split directly triggered a provision in the Certificate that provides for automatic conversion of shares of Series A Preferred Stock to Common Stock upon the price per share of Class A Common Stock, par value $0.0001 per share (the "Common Stock"), being equal to or exceeding $10.00 for twenty trading days out of thirty consecutive trading days (the "Automatic Conversion"). Consequently, and as detailed below, all of Plaintiffs' Series A Preferred Stock was involuntarily converted into Common Stock and Plaintiffs were thus deprived of the rights associated with Series A Preferred Stock.  On information and belief, the Individual Defendants are all owners of shares of Common Stock of MoneyLion, the value of which was pumped up at the expense of the holders of Series A Preferred Stock, including the Investors, by the Reverse Stock Split.

5.      Defendants' conduct breached Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), Defendants' fiduciary duties to Plaintiffs, and the terms of the Certificate.  By this action, Plaintiffs seek an award including but not limited to monetary damages for the value of shares of Series A Preferred Stock purchased by Plaintiffs and that were involuntarily converted to Common Stock, and disgorgement of all profits interested MoneyLion directors received in connection with the Reverse Stock Split, as detailed below.

## PARTIES, JURISDICTION AND VENUE

6.      Plaintiff Canaan X L.P. ("Canaan X") is a Cayman Islands limited partnership with its principal place of business in Menlo Park, California.  Canaan X owned shares of MoneyLion's Series A Convertible Preferred Stock, issued pursuant to the Amended & Restated Agreement and Plan of Merger, dated as of February 17, 2022 (the "Merger Agreement"), which were automatically converted to shares of Common Stock via the Automatic Conversion provision in Section 8 of the Certificate as a result of the Reverse Stock Split.

7.      Plaintiff Canaan XI L.P. ("Canaan XI") is a Cayman Islands limited partnership with its principal place of business in Menlo Park, California.  Canaan XI owned shares of MoneyLion's Series A Convertible Preferred Stock, issued pursuant to the Merger Agreement, which were automatically converted to shares of Common Stock via the Automatic Conversion provision in Section 8 of the Certificate as a result of the Reverse Stock Split.

8.      Plaintiff F-Prime Capital Partners Tech Fund LP ("F-Prime Capital") is a venture capital fund registered in Delaware with its principal place of business in Cambridge, Massachusetts.  F-Prime Capital owned shares of MoneyLion's Series A Convertible Preferred Stock, issued pursuant to the Merger Agreement, which were automatically converted to shares of Common Stock via the Automatic Conversion provision in Section 8 of the Certificate as a result of the Reverse Stock Split.

9.      Plaintiff GreatPoint Ventures Innovation Fund II, LP ("GreatPoint Ventures") is a Delaware limited partnership with its principal place of business in San

Francisco, California.  GreatPoint Ventures owned shares of MoneyLion's Series A Convertible Preferred Stock, issued pursuant to the Merger Agreement, which were automatically converted to shares of Common Stock via the Automatic Conversion provision in Section 8 of the Certificate as a result of the Reverse Stock Split.

10.     Plaintiff MassMutual Ventures US II LLC ("MassMutual Ventures") is a Delaware limited liability company with its principal place of business in Boston, Massachusetts.  MassMutual Ventures owned shares of MoneyLion's Series A Convertible Preferred Stock, issued pursuant to the Merger Agreement, which were automatically converted to shares of Common Stock via the Automatic Conversion provision in Section 8 of the Certificate as a result of the Reverse Stock Split.

11.     Defendant MoneyLion is a Delaware corporation with its principal place of business in New York, New York.

***Director and Officer Defendants***

12.     Defendant Diwakar Choubey ("Choubey") is, and at all times relevant hereto has been, a member of MoneyLion's Board of Directors and MoneyLion's Chief Executive Officer.  Defendant Choubey co-founded MoneyLion in 2013 and has served as its CEO since 2013.

13.     Defendant Richard Correia ("Correia") is, and at all times relevant hereto has been, MoneyLion's CFO.  Defendant Correia joined MoneyLion in 2016 and currently serves as its President, CFO, and Treasurer.

14.     Defendant Jeffrey Gary ("Gary") is, and at all times relevant hereto has been, a member of MoneyLion's Board of Directors.  Defendant Gary currently serves as the Chair of MoneyLion's Audit Committee.  Defendant Gary joined MoneyLion in 2020.

15.     Defendant Chris Sugden ("Sugden") is, and at all times relevant hereto has been, a member of MoneyLion's Board of Directors.  Defendant Sugden currently serves as the Chair of MoneyLion's Compensation Committee.  Defendant Sugden joined MoneyLion in 2016.

16.     Defendant Dwight Bush ("Bush") is, and at all times relevant hereto has been, a member of MoneyLion's Board of Directors.  Defendant Bush currently serves as the Chair of MoneyLion's Risk and Compliance Committee.  Defendant Bush joined MoneyLion in 2021.

17.     Defendant John Chrystal ("Chrystal") is, and at all times relevant hereto has been, a member of MoneyLion's Board of Directors.  Defendant Chrystal currently serves as MoneyLion's independent Chair of the Board.  Defendant Chrystal joined MoneyLion in 2016.

18.     Defendant Lisa Gersh ("Gersh") is, and at all times relevant hereto has been, a member of MoneyLion's Board of Directors.  Defendant Gersh currently serves as the Chair of MoneyLion's Nominating and Corporate Governance Committee.  Defendant Gersh joined MoneyLion in 2021.

19.     Defendant Matt Derella ("Derella") is, and at all times relevant hereto has been, a member of MoneyLion's Board of Directors.  Defendant Derella joined MoneyLion in 2021.

20.     Defendant Annette Nazareth ("Nazareth") is, and at all times relevant hereto has been, a member of MoneyLion's Board of Directors.  Defendant Nazareth joined MoneyLion in 2021.

21.     Defendant Michael Paull ("Paull") is, and at all times relevant hereto has been, a member of MoneyLion's Board of Directors.  Defendant Paull joined MoneyLion in 2021.

*Jurisdiction and Venue*

22.     The Court has original federal question jurisdiction over Plaintiffs' cause of action for violations of Section 14(a) of the Exchange Act under 28 U.S.C. § 1331 and Section 27 of the Exchange Act, 15 U.S.C. § 78a(a).

23.     The Court has supplemental jurisdiction under 28 U.S.C. § 1367 to hear Plaintiffs' other causes of action.

24.     Jurisdiction over MoneyLion and the Individual Defendants is based upon MoneyLion's presence and transaction of business in New York, where it is headquartered, as well as the execution of the Merger Agreement by and among MoneyLion Inc., Even Financial Inc. and Fortis Advisors LLC.  The conduct of Defendants as described herein primarily occurred in New York, New York.

25.     Venue is proper in the Southern District of New York because the parties have provided their express written consent to exclusive jurisdiction of the State and Federal courts located within the State of New York pursuant to Section 13.07 of the Merger Agreement.  Further, MoneyLion has its principal place of business in New York,

New York and conducts business in the District, and the events set forth herein largely took place in New York, New York.

## FACTUAL ALLEGATIONS

### *MoneyLion Series A Convertible Preferred Stock*

26.     MoneyLion describes itself as a "leading digital financial services and lifestyle content platform" that provides applications and services relating to banking and financial services for consumers and enterprise customers.   MoneyLion is a public company listed on the New York Stock Exchange (the "NYSE").

27.     In addition to selling shares on the NYSE, MoneyLion has also grown by acquisition.  The Plaintiffs in this case owned shares of a company called Even Financial, Inc., which MoneyLion acquired pursuant to the Amended & Restated Agreement and Plan of Merger, dated as of February 17, 2022 by and among MoneyLion, Even Financial Inc. and other parties named therein (the "Transaction").  As part of the Transaction, Plaintiffs acquired shares of MoneyLion Series A Preferred Convertible Stock, par value $0.0001, per the terms of the Certificate.

28.     Holders of Series A Preferred Stock issued in connection with the Transaction are entitled to certain rights, privileges, and protections under the Certificate which are not afforded to shares of MoneyLion Common Stock, including, for example, a liquidation preference and annual dividend.

29.     The Certificate also contains the Automatic Conversion provision, which states:

> Each share of Series A Preferred Stock shall automatically be converted (an "Automatic Conversion"), without any further action by the Holder of such

share of Series A Preferred Stock, into a number of shares of Common Stock equal to the Conversion Rate if the Parent Conversion Stock Price equals or exceeds $10.00 on any twenty (20) Trading Days (which may be consecutive or nonconsecutive) within any consecutive thirty (30) Trading Day period that ends no earlier than the last day of the Restricted Period for such share of Series A Preferred Stock (an "Automatic Conversion Event").

### The Reverse Stock Split

30.     Over the past few years, the price of MoneyLion's stock has fallen considerably.

31.     On information and belief, the Defendants sought to boost the price of MoneyLion's Common Stock but did so in a manner that stripped preferred shareholders, including the Investors, of valuable rights guaranteed by the Certificate, and also failed to previously disclose as much to all shareholders.

32.     In furtherance of this effort, on March 31, 2023, MoneyLion filed the Proxy Statement with the SEC.

33.     The Proxy Statement invited MoneyLion shareholders to a Special Meeting for the purpose of approving an amendment to the Fourth Amended and Restated Certificate of Incorporation.  The purpose of the amendment was to secure shareholder authorization for the Board to effect the Reverse Stock Split up to a 1-for-30 ratio, as follows:

> To approve an amendment to our Fourth Amended and Restated Certificate of Incorporation, in the form attached to the Proxy Statement as Annex A, to, at the discretion of the Board of Directors at any time on or prior to the twelve-month anniversary of the Special Meeting, effect (a) a reverse stock split with respect to our Class A common stock, par value $0.0001 per share ("Class A Common Stock"), either issued and outstanding or held by us as treasury stock, at a ratio of not less than 1-for-2 and not greater than 1-for-30, with the final ratio within such ratio range to be determined at the discretion of

the Board of Directors, and (b) a reduction in the number of authorized shares of Class A Common Stock by a corresponding proportion, in each case without further approval or authorization of our stockholders (such proposal, the "Reverse Stock Split Proposal").

34.     Failing to exercise reasonable care, Defendants caused the Proxy Statement to indicate that the rights of the preferred shareholders would not be affected by the Reverse Stock Split.  For example, the Proxy Statement stated that "[t]he Reverse Stock Split is not intended to modify the rights of existing stockholders in any material respect."   It further stated that "the Reverse Stock Split will affect all stockholders uniformly and will not affect any stockholder's percentage ownership interest in the Company."

35.     These statements were untrue at the time they were made because, on information and belief, the Reverse Stock Split was intended to wipe out the value of the preferred shareholders and, thereby, boost the value of MoneyLion common stock.  Indeed, that was the primary purpose of the Reverse Stock Split, which Choubey and Correia have since conceded, as described below.

36.     On April 19, 2023, MoneyLion held the special meeting where stockholders voted on the proposals contained in the Proxy Statement.

37.     At the April 19, 2023 Special Meeting, MoneyLion shareholders voted in favor of the measures proposed in the Proxy Statement, unaware that the Proxy Statement contained false and misleading statements and omitted material information about the potential consequences of the Reverse Stock Split with respect to the rights of Series A Preferred shareholders.

38.     On April 21, the Board approved the Reverse Stock Split.  The Company announced the results of the shareholder vote in a press release dated April 21, 2023, and via a Form 8-K filed with the SEC on April 24, 2023.

39.     Effective 5:01 pm on April 24, 2023, MoneyLion effected the Reverse Stock Split at the highest possible ratio referenced in the Proxy Statement—1-for-30—for the purpose of depriving Plaintiffs and other Series A Preferred shareholders of preferred rights granted by the Certificate.

40.     Although the Defendants could have exercised a Reverse Stock Split at a lower ratio, on information and belief, they chose the maximum possible ratio—1-for-30—specifically to adversely affect the Plaintiffs and other preferred shareholders.

41.     On June 8, 2023, a virtual meeting took place between Defendants and several of the Investors.  While the Proxy Statement had asserted that the "primary objective for effecting the Reverse Stock Split…is to…meet the minimum per share price requirement for continued listing on the NYSE," CEO Choubey and CFO Correia confirmed in that virtual meeting that Defendants' purpose in effecting the Reverse Stock Split at the 1-for-30 ratio was to trigger the Automatic Conversion provision and, thereby, alter the rights of the Series A Preferred shareholders under the Certificate.

42.     The closing price per share of MoneyLion Common Stock as listed on the NYSE on the day of the Reverse Stock Split, prior to the split, was $0.3662.  The opening price per share of Common Stock on April 25, the day following the Reverse Stock Split, as listed on the NYSE, was $10.77—positioning the per share price at almost precisely the level required in order to ultimately trigger the Automatic Conversion provision.

43.     This was the first time since September 22, 2021 that MoneyLion Common Stock, as listed on the NYSE, had a closing price per share equal to or greater than $10.00.

***The Automatic Conversion of Series A Preferred Shares***

44.     On May 26, 2023, citing Section 8 of the Certificate, Defendants triggered the Automatic Conversion provision when the price per share of MoneyLion Common Stock equaled or exceeded $10.00 for the twentieth trading day within a consecutive thirty-day trading day period.  All shares of Series A Preferred Stock issued and outstanding were therefore automatically converted into newly issued Class A Common Stock.

45.     The Company announced the Automatic Conversion in a June 1, 2023 Form 8-K filed with the SEC:

> Accordingly, as a result of the Automatic Conversion Event, following the close of trading on the New York Stock Exchange on May 26, 2023, all 30,049,053 shares of Series A Preferred Stock issued and outstanding automatically converted into 1,012,293 shares of newly issued Class A Common Stock based on the Conversion Rate, as calculated in accordance with the terms of the Certificate of Designations. In lieu of any fractional shares otherwise issuable to any Holder, the Company issued cash payments based on the Parent Conversion Stock Price on May 25, 2023, the Trading Day immediately preceding the Conversion Date.

46.     As a result of the Automatic Conversion, all shares of Plaintiffs' Series A Preferred Stock were involuntarily replaced overnight with Class A Common Stock, and Plaintiffs thereby lost the rights associated with their Series A Preferred Stock.

47.     These rights and preferences were materially and adversely modified by way of the Automatic Conversion triggered by the Reverse Stock Split, in contravention of the plain language in the Proxy Statement that "[t]he Reverse Stock Split [wa]s not intended to modify the rights of existing stockholders in any material respect[,]" and that

"the Reverse Stock Split will affect all stockholders uniformly and will not affect any stockholder's percentage ownership interest in the Company." The rights of the common stock, owned by MoneyLion directors and officers, were not affected by the Reverse Stock Split; only the preferred shareholders were injured.

48.     On information and belief, MoneyLion's directors and officers did not undertake an independent process to determine whether effecting the Reverse Stock Split in a manner that altered the rights of a class of shareholders was in the best interest of the company and, correspondingly, failing to accurately disclose in the Proxy Statement the ramifications of effecting the Reverse Stock Split accordingly.

49.     In addition to materially modifying the rights of Plaintiffs and all other Series A Preferred shareholders, the vote purportedly authorizing the Reverse Stock Split was in direct contravention of MoneyLion's corporate documents. For example, Section 12(b)(i) of the Certificate provides that:

> [T]he vote or consent of the Holders of a majority of the shares of Series A Preferred Stock outstanding at such time, voting together as a separate class, given in person or by proxy, either in writing without a meeting or by vote at any meeting called for the purpose, will be necessary for, directly or indirectly, effecting or validating any of the following actions, whether or not such approval is required pursuant to the DGCL:
>
> (i)     any amendment, waiver, alteration or repeal (whether by merger, consolidation or otherwise) of any provision of the Certificate of Incorporation (including this Certificate of Designations) or Bylaws that would have an adverse effect on the rights, preferences, privileges or voting power of the Series A Preferred Stock (for the avoidance of doubt, neither (i) an adverse effect on the rights, preferences, privileges or voting power of the Common Stock or (ii) the authorization or issuance of any Junior Stock of the Company, shall, in either case, be deemed to be an adverse effect on the rights, preferences, privileges or voting power of the Series A Preferred Stock).

13

50.     In directly undermining the voting rights of the Series A Preferred shareholders, as clearly set forth in the Certificate, MoneyLion did not solicit the required separate class vote or consent of Series A Preferred shareholders despite that the Reverse Stock Split would function to materially and adversely alter the rights of the Series A Preferred Shareholders under the Certificate.

51.     Defendants did not inform the Series A Preferred shareholders of the intent to remove their preferred rights and did not seek their vote as a class on that proposal.

52.     Moreover, each member of MoneyLion's Board and the executive officers who signed the Proxy Statement owned and/or had the right to acquire via equity incentive award shares of Common Stock, and these directors and officers therefore stood to benefit personally from the Automatic Conversion.

53.     On May 22, 2023, Plaintiffs by and through their counsel served Defendants with a demand to inspect certain books and records pursuant to Delaware General Corporation Law Section 220, asking that Defendants advise within five business days if they believed that the demand was somehow deficient or incomplete.  Nearly three weeks later, Defendants responded and advised that they would not produce any books or records claiming "procedural deficiencies" in Plaintiffs' demand letter.

## COUNT I
**(Violation of Section 14(a) of the Exchange Act as against all Defendants)**

54.     Plaintiffs reallege the allegations contained in Paragraphs 1 through 53 as though fully set forth herein.

55.     Section 14(a) of the Exchange Act (as implemented in SEC Rule 14a-9) prohibits proxy statements "containing any statement which, at the time and in the light of

the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading."

56.     The Proxy Statement filed on March 31, 2023 contained several material misrepresentations and omissions.

57.     In direct contravention of the Proxy Statement, Plaintiffs' rights were materially affected when their Series A Preferred Stock was automatically converted to Class A Common Stock, which does not offer the same rights as Series A Preferred Stock. Therefore, the statement in the Proxy Statement that "[t]he Reverse Stock Split is not intended to modify the rights of existing stockholders in any material respect" was false and misleading.

58.     Similarly, the statement in the Proxy Statement that "the Reverse Stock Split will affect all stockholders uniformly and will not affect any stockholder's percentage ownership interest in the Company" was false and misleading.

59.     Defendants knew or should have known that the Reverse Stock Split would increase the Common Stock price per share above $10.00 such that the Automatic Conversion provision would be triggered pursuant to the Certificate, which would function to eliminate the rights of preferred shareholders but not affect the rights of common shareholders.  The Proxy Statement therefore contained false statements and material omissions.

60.     Due to MoneyLion's material omissions from the Proxy Statement, which misled voting shareholders, the shareholder vote authorizing the Reverse Stock Split—and, indeed, the Reverse Stock Split itself—is defective under New York and federal securities law.

61.     Moreover, the false statements in the Proxy Statement have proximately caused damages to Plaintiffs, in an amount to be determined at trial.

## COUNT II
### (Breach of Fiduciary Duties as against the Individual Defendants)

62.     Plaintiffs reallege the allegations contained in Paragraphs 1 through 61 as though fully set forth herein.

63.     The Individual Defendants owed fiduciary duties to the Plaintiffs, which include the duty of loyalty.

64.     By orchestrating and voting in favor of the Reverse Stock Split, which diluted the value of the Series A Preferred Stock and deprived Series A Preferred shareholders of their rights, the Individual Defendants breached their fiduciary duties owed to all shareholders under New York law.

65.     The Proxy Statement emphasized that the primary purpose of effecting the Reverse Stock Split was to increase the price per share of the Common Stock in order to meet the minimum per share price requirement for listing on the NYSE.  But this objective could have been accomplished by effectuation of the Reverse Stock Split at a significantly lower ratio.

66.     To remain listed on the NYSE, MoneyLion Common Stock needed to achieve a price per share of just $1.00.  MoneyLion could have easily avoided delisting

from the NYSE with, for example, a 1-for-15 split, which would have resulted in a per share price of approximately $5.50.

67.    The Reverse Stock Split was implemented far beyond any reasonable need of MoneyLion to maintain its NYSE listing and was instead motivated by a desire to trigger the Automatic Conversion provision—an intent that the Proxy Statement failed to disclose to all shareholders.  Indeed, at a June 8, 2023 virtual meeting between MoneyLion and several of the Investors, Choubey and Correia stated explicitly that MoneyLion's purpose in effecting the Reverse Stock Split at the highest possible Proxy-referenced ratio was to trigger the Automatic Conversion provision for the benefit of the common stock shareholders, thereby depriving the Investors of rights attached to the Series A Preferred Stock.

68.    In soliciting the shareholders' consent pursuant to the false and misleading Proxy Statement and subsequently consummating the Reverse Stock Split, Defendants concealed their intent to trigger the Automatic Conversion provision and, thereby, deprive the holders of the Series A Preferred Stock of their rights, preferences and privileges entitled to them under the Certificate.  In so doing, the Individual Defendants breached their fiduciary duty of loyalty and care, as owed to all shareholders including the Plaintiffs.

69.    Moreover, as detailed above, the Individual Defendants also had material conflicts of interest at the time of the Reverse Stock Split vote because MoneyLion's Board and the executive officers who signed the Proxy Statement either owned or had the right to acquire via equity incentive award shares of Common Stock.  Further, on information and belief, none of the Individual Defendants recused themselves from the discussion or vote

concerning the Reverse Stock Split and Automatic Conversion. Further, on information and belief, MoneyLion directors and officers stood to benefit from the Automatic Conversion, ultimately to the detriment of and unbeknownst to MoneyLion's shareholders to whom those officers owed a fiduciary duty of loyalty and care.

### COUNT III
### (Breach of Contract as against all Defendants)

70.    Plaintiffs reallege the allegations contained in Paragraphs 1 through 69 as though fully set forth herein.

71.    The Certificate constitutes a valid contract between MoneyLion and all MoneyLion shareholders, including Plaintiffs.

72.    New York law implies a covenant of good faith and fair dealing in every contract pursuant to which neither party may take any action that has the effect of destroying the other's right to receive the fruits of the contract.

73.    MoneyLion and the Individual Defendants had knowledge of the existence and terms of the Certificate.

74.    As described above, the vote purporting to authorize the Reverse Stock Split violated the voting rights of the Plaintiffs and other holders of MoneyLion Series A Preferred Stock insofar as the Certificate required that:

> [T]he vote or consent of the Holders of a majority of the shares of Series A Preferred Stock outstanding at such time, voting together as a separate class, given in person or by proxy. . . will be necessary for, directly or indirectly, whether or not such approval is required pursuant to the DGCL . . . **any amendment, waiver, alteration or repeal (whether by merger, consolidation or otherwise) of any provision of the Certificate of Incorporation (including this Certificate of Designations) or Bylaws that would have an adverse effect on the rights, preferences, privileges or voting power of the Series A Preferred Stock** (for the avoidance of

doubt, neither (i) an adverse effect on the rights, preferences, privileges or voting power of the Common Stock or (ii) the authorization or issuance of any Junior Stock of the Company, shall, in either case, be deemed to be an adverse effect on the rights, preferences, privileges or voting power of the Series A Preferred Stock) . . . (Emphasis added.)

75.     Despite this requirement, and knowing that the Reverse Stock Split would come to trigger an alteration of the rights of the Series A Preferred shareholders under the Certificate, MoneyLion did not solicit the separate class vote or consent of Series A Preferred shareholders.

76.     Moreover, voting shareholders were not apprised of the intent to strip the Series A Preferred shareholders of their rights.

77.     By failing to solicit the necessary separate class vote or consent, Defendants breached Section 12 of the Certificate.

78.     Defendants' breach of the Certificate has caused damage to Plaintiffs and deprived Plaintiffs of their rights under MoneyLion's corporate documents.

## COUNT IV

### (Declaratory Judgment as against all Defendants)

79.     Plaintiffs reallege the allegations contained in Paragraphs 1 through 78 as though fully set forth herein.

80.     An actual controversy has arisen and now exists between the Plaintiffs, on one hand, and MoneyLion and the Individual Defendants on the other, concerning the rights of Plaintiffs under MoneyLion's Certificate and the required shareholder vote to approve the Reverse Stock Split.

81.     Specifically, the parties are in dispute as to whether, under the Certificate, the vote to approve the Reverse Stock Split was improper because it did not involve a separate class vote or consent of Series A Preferred shareholders.

82.     Plaintiffs desire a judicial determination of Plaintiffs' rights under the Certificate.  Specifically, Plaintiffs request a judicial determination that (1) under the Certificate, the Reverse Stock Split required the separate class vote or consent of Series A Preferred shareholders; and (2) because the aforementioned vote or consent did not occur, the vote that occurred was improper, and therefore MoneyLion and its Board violated the Certificate.

83.     A judicial determination is necessary and appropriate at this time in order that each of the parties may ascertain their respective rights and duties to each other, to the extent they exist, and so that they may conduct themselves accordingly now and in the future.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request a jury trial for all issues so triable and ask the

Court to enter Judgment in its favor, and against the Defendant MoneyLion, and to enter

an Order:

a)      Declaring that the vote to approve the Reverse Stock Split was improper, as described above, and that therefore MoneyLion and its Board violated the Certificate;

b)      Holding MoneyLion liable for actual damages in such amount as the Court may determine;

c)      Awarding Plaintiffs damages equal to the value of the shares of Preferred Stock Plaintiffs purchased that were automatically converted to shares of Common Stock by way of Defendants' unlawful conduct;

d)      Disgorging all profits interested MoneyLion directors received as a result of the Reverse Stock Split;

e)      Awarding punitive damages;

f)      Awarding Plaintiffs pre- and post-judgment interest;

g)      Awarding Plaintiffs their attorneys' fees and costs; and

h)      Awarding Plaintiffs such other further relief as the Court deems just and proper.

Dated: July 27, 2023

Respectfully submitted,

/s/ Jeffrey A. Simes

Jeffrey A. Simes
Alexander Talel
GOODWIN PROCTER LLP
620 Eighth Avenue
New York, NY  10018
Tel. (212) 813-8800
Fax (212) 355-3333
jsimes@goodwinlaw.com
atalel@goodwinlaw.com

*Attorney for Plaintiffs*
*Canaan X L.P., Canaan XI*
*L.P., F-Prime Capital*
*Partners Tech Fund LP,*
*GreatPoint Ventures*
*Innovation Fund II, L.P., and*
*MassMutual Ventures US II*
*LLC*