

Jeffrey A. Simes                          Goodwin Procter LLP
+1 212 813 8879                           The New York Times Building
jsimes@goodwinlaw.com                     620 Eighth Avenue
                                          New York, NY 10018

                                          goodwinlaw.com
                                          +1 212 813 8800

October 6, 2023

**VIA ECF**

The Honorable P. Kevin Castel
United States District Judge
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, NY 10007

Re:     *Canaan X L.P., et al. v. MoneyLion Inc., et al.,* Civil Action No. 1:23-cv-6550-PKC

Dear Judge Castel:

We represent Plaintiffs Canaan X L.P., Canaan XI L.P., F-Prime Capital Partners Tech Fund LP, GreatPoint Ventures Innovation Fund II, L.P., and MassMutual Ventures US II LLC in the above-referenced matter and we respond to the September 27, 2023 pre-motion letter (ECF No. 46) submitted by Defendants' counsel in anticipation of a motion to dismiss the Complaint (the "Pre-Motion Letter"). The next conference before the Court is October 13, 2023.

In the Pre-Motion Letter, Defendants identify no pleading defects in the Complaint, but instead assert certain purported legal defenses, which Plaintiffs contend either lack merit or are premature. Based on the Pre-Motion letter, Plaintiffs do not intend to not seek leave to amend the Complaint. Plaintiffs believe that the merits of Defendants' arguments will be better addressed in plenary briefing, but we briefly summarize the shortcomings in Defendants' proposed motion as follows.

*Background*

The operative facts are laid out in the Complaint and the parties' Joint Letter, which was filed by ECF on October 5, 2023. (ECF Nos. 1 & 51). Briefly summarizing, Plaintiffs were investors in Even Financial Inc. which merged into Defendant MoneyLion Inc. on February 17, 2022. As part of that merger agreement, Plaintiffs received Series A Convertible Preferred Stock in MoneyLion. As agreed among the parties in the MoneyLion Certificate of Designations, Plaintiffs would enjoy preferred shareholder rights and benefits unless and until the price of MoneyLion's common stock exceeded $10.00/share for twenty of thirty consecutive trading days (this mechanism, called the "automatic conversion," would then leave Plaintiffs as common shareholders). In other words, if the Company's financial performance resulted in a sustained higher share price redounding to the benefit of Plaintiffs and other shareholders, Plaintiffs' special rights would then be relinquished.



The Honorable P. Kevin Castel
October 6, 2023
Page 2

Defendants contrived to take away Plaintiffs' rights prematurely and artificially, and they did so by means of a March 31, 2023 Proxy Statement (the "Proxy Statement") that falsely described Defendants' plan and actions.  The Proxy Statement specifically assured Plaintiffs and other shareholders of MoneyLion that "[t]he Reverse Stock Split is not intended to modify the rights of existing stockholders in any material respect."  It also stated that "the Reverse Stock Split will affect all stockholders uniformly and will not affect any stockholder's percentage ownership interest in the Company…"

These were false statements.  As alleged in the Complaint (¶ 41), "CEO Choubey and CFO Correia confirmed in [a June 8, 2023] virtual meeting that Defendants' purpose in effecting the Reverse Stock Split at the 1-for-30 ratio was to trigger the Automatic Conversion provision and, thereby, alter the rights of the Series A Preferred shareholders under the Certificate."  In other words, Defendants effectively admitted that they had arranged for a much larger than necessary reverse stock split solely for the purpose of stripping away Plaintiffs' bargained-for rights.  The Reverse Stock Split procured by the false Proxy Statement took place on April 24, 2023, and Defendants thereafter invoked the automatic conversion in the Certificate of Designations.  Notably, that conversion "position[ed] the per share price at almost precisely the level required in order to ultimately trigger the Automatic Conversion provision."  (Compl. ¶ 42.)  Moreover, Defendants effected the automatic conversion without conducting a separate vote of the preferred shareholders as provided for in § 12(b)(i) of the Certificate of Designations.

After pre-suit discussions failed, Plaintiffs brought this action on July 27, 2023, asserting four causes of action:  (1) violation of Section 14(a) of the Exchange Act of 1934 ("Exchange Act") against all Defendants (Count I); (2) breach of fiduciary duties against the individual Defendants (Count II); (3) breach of contract against all Defendants (Count III); and (4) declaratory judgment against all Defendants (Count IV).

***Discussion of Proposed Motion to Dismiss***

**1.      Violation of Section 14(a) of the Exchange Act (Count I)**

Defendants' primary argument appears to be that the Proxy Statement was not false because the Reverse Stock Split itself did not take away any shareholders' rights or unevenly affect any shareholders, but rather the Automatic Conversion did so.  Defendants' denial of falsity simply does not hold water. The Complaint specifically alleges that Defendants sought to procure an overly aggressive Reverse Stock Split for the exact purpose of triggering the automatic conversion and wiping out Plaintiffs' preferred interests. (Compl. ¶¶ 33-35, 41.)  Indeed, Defendants Choubey and Correia confirmed that Defendants' purpose in effecting the 1-for-30 Reverse Stock Split "was to trigger the Automatic Conversion provision and, thereby, alter the rights of the Series A Preferred shareholders under the Certificate."  (*Id.* ¶ 41.) Defendants' representations to MoneyLion's shareholders that "[t]he Reverse Stock Split is not intended to modify the rights of existing stockholders in any material respect[,]" and "the Reverse Stock Split will affect all stockholders uniformly and will not affect any stockholder's percentage ownership interest in the Company" were intentional untruths. (*See id.* ¶¶ 34, 57-58.)  The entirely foreseeable consequence



The Honorable P. Kevin Castel
October 6, 2023
Page 3

of Defendants' conduct—indeed, its intent—was the elimination of the preferred shareholders' rights.  For Defendants to argue that the Reverse Stock Split did not harm Plaintiffs because the Automatic Conversion is the equivalent of a driver seeking to evade a speeding ticket by claiming she merely pressed the gas pedal and it was the car that exceeded the speed limit.

Second, Defendants contend that the false statements in the Proxy Statement were not material.  At the outset, questions of materiality such as those presented here involve issues of fact not appropriately resolved on a motion to dismiss.  *See, e.g., In re Fuwei Films Sec. Litig.*, 634 F. Supp. 2d 419, 441-42 (S.D.N.Y. 2009) ("granting Plaintiff the inferences to which he is entitled, the Court cannot find, as a matter of law at this stage of these proceedings, that a reasonable investor could not find this information 'significant' to his or her investment decision").  Indeed, Defendants would bear the burden to show that each false statement was "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of [its] importance." *In re Tufin Software Techs. Ltd. Sec. Litig.*, 2022 WL 596861, at *5 (S.D.N.Y. Feb. 25, 2022).  Defendants cannot meet this burden here.

Defendants also argue that the Proxy Statement did not need to disclose Defendants' intent to convert the preferred shareholder, but the cases they cite confirm that "all of the relevant facts which a reasonable shareholder would need to make a decision on a proposed corporate action" must be disclosed. *Lewis v. Potlatch Corp.*, 716 F. Supp. 807, 809 (S.D.N.Y. 1989).  Any reasonable shareholder would have wanted to be aware of the unique interest held by preferred shareholders vis-à-vis the Reverse Stock Split in order to cast a fully-informed vote that accounted for potential exposure to liability for the very harm Plaintiffs suffered as a result of the Reverse Stock Split and which is alleged in the Complaint.  Moreover, reasonable shareholders of a growth stage company such as MoneyLion would want to know of Defendants' scheme to alienate a group of preferred investors that included well-known financial institutions given the significant reputational and industry risks this could entail. The materiality of Defendants' conduct— separate and aside from Defendants' ultimate "management motive" in effectuating the Reverse Stock Split—is evident under the very case law Defendants cite.

Third, Defendants argue that Plaintiffs' injury was not caused by the Reverse Stock Split but was the result of the terms of the Certificate of Designations, which included the Automatic Conversion feature.  Again, Defendants are too clever by half.  The operative provision in the Certificate of Designations—the automatic conversion—did not spring forth like Athena from Zeus; had Defendants not fabricated a ruse to trigger that provision, no harm would have come to Plaintiffs.  Attempting to divorce Defendants' conduct from Plaintiffs' harm through semantical acrobatics merely dodges the nature of that harm and how Defendants brought it about, the full extent of which will be elucidated in discovery.

## 2.    Breach of Fiduciary Duties (Count II)

Defendants' suggestion that a board never owes fiduciary duties to preferred shareholders is belied by the case law Defendants cite.  That case law makes clear that boards do not owe fiduciary duties to preferred



The Honorable P. Kevin Castel
October 6, 2023
Page 4

shareholders that are distinct from a board's preexisting fiduciary duties owed to all shareholders. But in no way does this case law stand for the proposition that preferred shareholders are never owed fiduciary duties. *See, e.g., Jackson Nat. Life Ins. Co. v. Kennedy*, 741 A.2d 377, 386 (Del. Ch. 1999) ("A corporation's directors 'are fiduciaries for the [p]referred stockholders, whose interests they have a duty to safeguard, consistent with the fiduciary duties owed by those directors to [the corporation's] other shareholders and to [the corporation] itself.'") (quoting *Eisenberg v. Chicago Milwaukee Corp.*, Del. Ch., 537 A.2d 1051, 1062 (1987)). That Plaintiffs happen to have been preferred shareholders does not relieve Defendant board members of the fiduciary duties they owed to Plaintiffs.

Moreover, the Complaint alleges several distinct breaches of fiduciary duty not addressed by Defendants. Defendants owed a duty of candor to all shareholders, which they breached by procuring an unauthorized transaction by means of falsehoods and material omissions. *In re Mindbody, Inc., S'holder Litig.*, No. 2019-0442-KSJM, 2023 WL 2518149, at *31 n.494 (Del. Ch. Mar. 15, 2023) ("[The duty of candor] represents nothing more than the well-recognized proposition that directors of Delaware corporations are under a fiduciary duty to disclose fully and fairly all material information within the board's control when it seeks shareholder action.") (quoting *Stroud v. Grace*, 606 A.2d 75, 84 (Del. 1992)). In addition, Defendants personally "stood to benefit from the Automatic Conversion" they arranged (Compl. ¶ 69), and they failed to engage in any independent process that might insulate against such conflicts. (*Id.* ¶ 48.) Plaintiffs have adequately stated breaches of fiduciary duties by Defendants.

### 3.   <u>Breach of Contract (Count III)</u>

The essence of Plaintiffs' breach of contract claim is that Defendants promised that Plaintiffs would enjoy preferred shareholder rights unless and until the share price of MoneyLion reached an agreed market price for an agreed duration. In bad faith, and by means of false statements and improper conduct, Defendants artificially triggered the automatic conversion for the specific purpose of manipulating the MoneyLion share price to the contractual trigger, thereby eliminating the rights Defendants had just granted to Plaintiffs. This is a classic case of breach of the implied covenant of good faith and fair dealing, which "requires a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the bargain." *Am. Healthcare Admin. Servs., Inc. v. Aizen*, 285 A.3d 461, 479 (Del. Ch. 2022) (quoting *Glaxo Grp. Ltd. v. DRIT LP*, 248 A.3d 911, 920 (Del. 2021)); *accord Dalton v. Educ. Testing Serv.*, 87 N.Y.2d 384, 389, 663 N.E.2d 289, 291 (N.Y. 1995) ("[N]either party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.").

Defendants also breached the express provisions of the Certificate of Designations that required the affirmative vote of a majority of the Class A Preferred Shareholders before "any amendment, waiver, alteration or repeal (whether by merger, consolidation or otherwise) of any provision of the Certificate of Incorporation (including this Certificate of Designations) or Bylaws that would have an adverse effect on the rights, preferences, privileges or voting power of the Series A Preferred Stock. . . ." Here, Defendants



The Honorable P. Kevin Castel
October 6, 2023
Page 5

sought to alter the parties' arrangements by unilaterally triggering an automatic conversion that could only have been triggered by naturally-occurring movements in the market price of MoneyLion's stock.

Defendants rely on *Greenmont Cap. Partners I, LP v. Mary's Gone Crackers, Inc.*, 2012 WL 4479999 (Del. Ch. Sept. 28, 2012), but that case involved a Certificate of Incorporation which expressly permitted an automatic conversion of preferred stock into common stock upon a majority vote of the preferred shares. The majority of preferred shareholders so voted, and a holder of one class of preferred stock asserted that the consent of a majority of that particular class of preferred shareholders was required to effectuate the subsequent change to the Certificate of Incorporation that eliminated referenced to preferred stock. The Court of Chancery disagreed, finding that the conversion did not alter the rights of the dissenting shareholder, since the certificate did not grant that class of shareholder the right to vote separately on the conversion. *Id.* at *4-5. The court found that automatic conversion is one of the "special rights, privileges or restrictions" created by the Charter because the preferred shareholders were empowered to vote to approve it and did in fact do so. *Id.* at *5. Unlike in *Greenmont*, where the shareholder sought to challenge a conversion that the preferred shareholders supported and which followed the precise mechanisms agreed to by the parties in the certificate in question, Defendants sought in this case to deprive Plaintiffs of their protections by triggering a conversion without a vote of the preferred, and by means of false statements to the shareholders generally. Ultimately, the contention that the Reverse Stock Split "itself in no way impacted Plaintiffs' rights," as Defendants assert, is a facile and self-serving proposition that assumes Defendants' good faith and candor, both of which are challenged by the allegations in the Complaint.

## 4.    Declaratory Judgment (Count IV)

Defendants assert that the claim for declaratory judgment merely duplicates the claim for breach of contract. Plaintiffs do not intend to seek judgment on unnecessary claims but believe that Defendants' contention is premature, as the precise scope of the record and the parties' arguments will require development through discovery.

* * * * *

In conclusion, Plaintiffs believe that the proposed motion to dismiss lacks merit, raises contentions that would be premature, and is unwarranted in light of the allegations in the Complaint. Plaintiffs agree to the proposed briefing schedule set forth in the Pre-Motion Letter.



The Honorable P. Kevin Castel
October 6, 2023
Page 6


Respectfully Submitted,

*/s/ Jeffrey A. Simes*

Jeffrey A. Simes

cc:      All Counsel of Record by ECF