**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CANAAN X L.P., CANAAN XI L.P., F-PRIME CAPITAL PARTNERS TECH FUND LP, GREATPOINT VENTURES INNOVATION FUND II, L.P., and MASSMUTUAL VENTURES US II LLC, <br><br> Plaintiffs, <br><br> v. <br><br> MONEYLION INC., DIWAKAR CHOUBEY, RICHARD CORREIA, JEFFREY GARY, CHRIS SUGDEN, DWIGHT BUSH, JOHN CHRYSTAL, LISA GERSH, MATT DERELLA, ANNETTE NAZARETH, and MICHAEL PAULL, <br><br> Defendants. | Civil Action No.  23-cv-6550-PKC |

## PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS COMPLAINT

GOODWIN PROCTER LLP
Jeffrey A. Simes
Alexander Talel
620 Eighth Avenue
New York, NY 10018
Tel.: (212) 813-8800
Fax: (212) 355-3333

*Attorneys for Plaintiffs Canaan X L.P.,*
*Canaan XI L.P., F-Prime Capital Partners*
*Tech Fund LP, GreatPoint Ventures*
*Innovation Fund II, L.P., and MassMutual*
*Ventures US II LLC*

December 6, 2023

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ................................................................................ 1

FACTUAL BACKGROUND ................................................................................... 3

ARGUMENT ......................................................................................................... 5

    I.    Legal Standard. ..................................................................................... 5

    II.   The Complaint Pleads a Claim Under § 14(a) of the Exchange Act (Count I)........................................................................................................ 6

          A.    The Complaint Pleads That the Proxy Statement Contained False Statements. ......................................................................... 7

          B.    Plaintiffs Have Sufficiently Pled Materiality and Causation. ................ 11

    III.  The Complaint Pleads a Claim For Breach of Fiduciary Duty. ........................... 15

    IV.  The Complaint Pleads a Claim For Breach of Contract. ..................................... 17

    V.   Declaratory Judgment Is Not Needed Where Defendants Concede the Validity and Enforceability of the Parties' Contract............................................ 20

CONCLUSION ....................................................................................................... 20

## **<u>TABLE OF AUTHORITIES</u>**

**Page(s)**

**Cases**

*Am. Healthcare Admin. Servs., Inc. v. Aizen*,
   285 A.3d 461 (Del. Ch. 2022)....................................................................................19

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009).....................................................................................................5

*Assured Guar. Mun. Corp. v. UBS Real Est. Sec., Inc.*,
   2012 WL 3525613 (S.D.N.Y. Aug. 15, 2012)..............................................................9

*In re Banco Bradesco S.A. Sec. Litig.*,
   277 F. Supp. 3d 600 (S.D.N.Y. 2017).........................................................................13

*Buonasera v. Honest Co.*,
   208 F. Supp. 3d 555 (S.D.N.Y. 2016)...........................................................................6

*Castellano v. Young & Rubicam, Inc.*,
   257 F.3d 171 (2d Cir. 2001)........................................................................................15

*Cedarview Opportunities Master Fund, L.P. v. Spanish Broad. Sys., Inc.*,
   2018 WL 4057012 (Del. Ch. Aug. 27, 2018) ..............................................................20

*In re Columbia Pipeline Grp., Inc.*,
   2021 WL 772562 (Del. Ch. Mar. 1, 2021)...................................................................16

*Commodity Futures Trading Comm. V. TFS-ICAP, LLC*,
   432 F. Supp. 3d 320 (S.D.N.Y. 2020)...........................................................................8

*Cygnus Opportunity Fund, LLC v. Washington Prime Grp., LLC*,
   2023 WL 5113279 (Del. Ch. Aug. 9, 2023) ................................................................16

*Dalton v. Educ. Testing Serv.*,
   87 N.Y.2d 384 (N.Y. 1995) .......................................................................................19

*Donoghue v. Gad*,
   2022 WL 3156181 (S.D.N.Y. Aug. 8, 2022)..................................................................2

*Doe v. Columbia Univ.*,
   831 F.3d 46 (2d Cir. 2016)..........................................................................................10

*Dunlap v. State Farm Fire & Cas. Co.*,
   878 A.2d 434 (Del. 2005) ...........................................................................................19

i

*Edinburgh Holdings, Inc. v. Educ. Affiliates, Inc.*,
2018 WL 2727542 (Del. Ch. June 6, 2018) ........................................................19

*Enzo Biochem, Inc. v. Harbert Discovery Fund, LP*,
2021 WL 4443258 (S.D.N.Y. Sept. 27, 2021) ..................................................9, 13

*Erickson v. Jernigan Cap., Inc.*,
2022 WL 3028627 (S.D.N.Y. Aug. 1, 2022) .......................................................14

*Fletcher Int'l, Ltd. v. ION Geophysical Corp.*,
2010 WL 2173838 (Del. Ch. May 28, 2010) .......................................................17

*Frederick Hsu Living Tr. v. ODN Holding Corp.*,
2017 WL 1437308 (Del. Ch. Apr. 14, 2017) .......................................................17

*Fresno Cnty. Employees' Ret. Ass'n v. comScore, Inc.*,
268 F. Supp. 3d 526 (S.D.N.Y. 2017) .................................................................12

*Furlong Fund LLC v. VBI Vaccines, Inc.*,
2016 WL 1181710 (S.D.N.Y. Mar. 25, 2016) ........................................................9

*In re Fuwei Films Sec. Litig.*,
634 F. Supp. 2d 419 (S.D.N.Y. 2009) .................................................................11

*Goldberger v. Baker*,
442 F. Supp. 659 (S.D.N.Y. 1977) .....................................................................10

*Greenapple v. Detroit Edison Co.*,
618 F.2d 198 (2d Cir. 1980) .................................................................................9

*Greenmont Cap. Partners I, LP v. Mary's Gone Crackers, Inc.*,
2012 WL 447999 (Del. Ch. Sept. 28, 2012) ........................................................18

*Jackson Nat'l Life Ins. Co. v. Kennedy*,
741 A.2d 377 (Del. Ch. 1999) ............................................................................17

*Koppel v. 4987 Corp.*,
167 F.3d 125 (2d Cir. 1999) ...............................................................................15

*LBBW Luxemburg S.A. v. Wells Fargo Sec. LLC*,
10 F. Supp. 3d 504 (S.D.N.Y. 2014) .....................................................................8

*Lewis v. Potlatch Corp.*,
716 F. Supp. 807 (S.D.N.Y. 1989) .....................................................................13

*McMahan & Co. v. Warehouse Entertainment, Inc.*,
900 F.2d 576 (2d Cir. 1990) .................................................................................9

*Mendell v. Greenberg*,
    927 F.2d 667 (2d Cir. 1990)...........................................................................12

*In re Mindbody, Inc., S'holder Litig.*,
    2023 WL 2518149 (Del. Ch. Mar. 15, 2023).............................................15

*N.J. Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC*,
    709 F.3d 109 (2d Cir. 2013)...........................................................................5

*In re Pattern Energy Grp. Inc. S'holders Litig.*,
    2021 WL 1812674 (Del. Ch. May 6, 2021)................................................16

*McIntosh v. Katapult Holdings, Inc.*,
    2023 WL 5049044 (S.D.N.Y. Aug. 8, 2023)..............................................6

*TSC Indus., Inc. v. Northway, Inc.*,
    426 U.S. 438 (1976).........................................................................................6

*United Paperworkers Int'l Union v. Int'l Paper Co.*,
    985 F.2d 1190 (2d Cir. 1993)..................................................................11, 13

*Virginia Bankshares, Inc. v. Sandberg*,
    501 U.S. 1083 (1991)....................................................................................15

*Zirn v. VLI Corp.*,
    681 A.2d 1050 (Del. 1996)...........................................................................16

**Statutes and Other Authorities**

8 Delaware Code § 220.........................................................................................5

15 U.S.C. § 78n.............................................................................................*passim*

17 C.F.R. § 240.14a-9...........................................................................................6

Fed. Rule Civ. Proc. 12(b)(6)....................................................................5, 9, 10

Plaintiffs Canaan X L.P., Canaan XI L.P., F-Prime Capital Partners Tech Fund LP, GreatPoint Ventures Innovation Fund II, L.P., and MassMutual Ventures US II LLC respectfully submit this Opposition to Defendants' Motion to Dismiss.

## PRELIMINARY STATEMENT

This case arises from Defendants' scheme to strip Plaintiffs of their rights as preferred shareholders of MoneyLion, Inc. ("MoneyLion" or the "Company"). Plaintiffs became shareholders of MoneyLion on February 17, 2022, when they merged their company, Even Financial Inc., into MoneyLion in return for Series A Convertible Preferred Stock in MoneyLion. As part of the deal, Plaintiffs were promised special rights as preferred shareholders unless and until the price of MoneyLion's common stock exceeded $10/share for twenty of thirty consecutive trading days (an "automatic conversion" would then convert Plaintiffs into common shareholders). That is, the parties agreed that Plaintiffs would lose their preferred rights only if MoneyLion hit a plateau of financial success redounding to the benefit of Plaintiffs and other shareholders.

When that success did not materialize, Defendants chose to manipulate the price of MoneyLion stock through a 1-for-30 reverse stock split (the "Reverse Stock Split") to artificially invoke the conversion trigger (the "Automatic Conversion"). MoneyLion's Chief Executive Officer ("CEO") and Chief Financial Officer ("CFO") later admitted that the purpose of the Reverse Stock Split and its higher-than-necessary ratio of conversion was to procure the Automatic Conversion trigger and thus wipe out the preferred shareholders.  Yet, Defendants failed to mention any of this to shareholders when they sought approval for the Reverse Stock Split.  The March 31, 2023 Proxy Statement (the "Proxy Statement") Defendants issued instead falsely stated that "[t]he Reverse Stock Split is not intended to modify the rights of existing stockholders in any material respect."  MoneyLion Inc., Schedule 14A Proxy Statement dated March 31, 2023 (the "Proxy Statement"), located at sec.gov/Archives/edgar/data/1807846/000121390023025534

/def14a0323_moneylion.htm, at 7.[1]  It also stated that the Reverse Stock Split will "affect all stockholders uniformly and will not affect any stockholder's percentage ownership interest in the Company…."  Proxy Statement at 9.  Directly through these false statements, Defendants procured the vote of the MoneyLion shareholders on April 24, 2023, and MoneyLion converted Plaintiffs' preferred shares into common stock.  Plaintiffs brought this action on July 27, 2023, asserting (1) violation of Section 14(a) of the Exchange Act of 1934 ("Exchange Act") (Count I); (2) breach of fiduciary duties against the individual Defendants (Count II); (3) breach of contract (Count III); and (4) declaratory judgment (Count IV).

Defendants' opposition is a hyper-technical "kitchen sink" exercise that entirely misses the core of the Complaint's allegations.  First, Defendants argue that when they told all stockholders that no "stockholder" would lose rights or have their ownership affected, the stockholders should have somehow understood that this broad assertion was implicitly limited to the common stockholders.  This proposition makes no sense;  the plain language of these statements, read in context, provided assurance to stockholders that their votes would not result in harm to <u>any</u> stockholder, including the preferred.  Indeed, that is how Plaintiffs understood it.  In any event, Defendants' argument that their chosen words mean something other than what they actually said is not a proper argument on a motion to dismiss.

Defendants next assert that the false Proxy Statement was immaterial or did not cause injury, because it was the Automatic Conversion that effected harm, not the Reverse Stock Split itself, or because the stock price could have fallen irrespective of any conduct on Defendants' part.

---

[1] The Court may consider the Proxy Statement, as it is referenced in and essential to the Complaint.  *Donoghue v. Gad*, 2022 WL 3156181, at *2 (S.D.N.Y. Aug. 8, 2022) ("Additionally, the Court may consider any written instrument attached to the Complaint as an exhibit, any statements or documents incorporated by reference in the Complaint, documents that are 'integral' to the Complaint even if they are not incorporated by reference, and matters of which judicial notice may be taken.") (citing *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002)).

That is sophistry.  As the Complaint alleges, Defendants' avowed intent was to use the Reverse Stock Split as the means to manipulate the share price to trigger the Automatic Conversion.  The result was precisely the one orchestrated and intended by Defendants.  But for Defendants' machinations, the Plaintiffs would have remained preferred shareholders.  While materiality and causation are rarely decidable on a motion to dismiss, the record here leaves no doubt that both are amply satisfied.

Defendants next argue that preferred shareholders cannot assert fiduciary duty claims.  That is incorrect.  The Defendants breached their duty to <u>all</u> shareholders by speaking falsely and breaching their duty of candor.  Under Delaware law, all MoneyLion shareholders had a right to know why Defendants acted as they did and Defendants deprived all shareholders of that right, including Plaintiffs, by failing to disclose the truth concerning the Reverse Stock Split.

Finally, Defendants breached the parties' agreement—the Certificate of Designations of Series A Convertible Preferred Stock (the "Certificate of Designations")—both by failing to obtain a majority vote of Class A Preferred Shareholders, and by using false statements and improper conduct to claw back the consideration granted to Plaintiffs under that contract.  The agreement at issue unequivocally granted Plaintiffs preferred rights unless and until MoneyLion achieved stable financial success.  It did not, and Defendants breached that agreement and its implied covenant of good faith and fair dealing by manufacturing the circumstances that would allow them to vitiate their promises.

For all the foregoing reasons, Defendants' motion to dismiss should be denied.

## FACTUAL BACKGROUND

Plaintiffs were investors in Even Financial Inc., which merged into Defendant MoneyLion Inc. on February 17, 2022.  (Dkt. No. 1, Complaint ("Compl.") at ¶ 27.)  Plaintiffs received Series A Convertible Preferred Stock (the "Series A Preferred Stock") in MoneyLion as part of that

merger.  (*Id.*)  A crucial part of the consideration Plaintiffs received was the promise in the MoneyLion Certificate of Designations that Plaintiffs would enjoy preferred shareholder rights unless and until the price of MoneyLion's common stock exceeded $10/share for twenty of thirty consecutive trading days.  (*Id.* at ¶ 29.)  That is, the parties agreed that Plaintiffs would retain special rights unless and until MoneyLion achieved a stable plateau of financial success that would warrant the elimination of Plaintiffs' special rights.

MoneyLion's stock price fell rather than increased.  (*Id.* at ¶ 30.)  Having failed to grow MoneyLion's business to reach the Automatic Conversion threshold through market forces, Defendants set out to procure it by ruse.  Defendants issued the March 31, 2023 Proxy Statement seeking shareholder consent for the Reverse Stock Split which falsely described Defendants' plan. (*Id.* at ¶ 32.)  The Proxy Statement assured MoneyLion shareholders that "[t]he Reverse Stock Split [was] not intended to modify the rights of existing stockholders in any material respect." (*Id.* at ¶ 34.)  It further represented that "the Reverse Stock Split will affect all stockholders uniformly and will not affect any stockholder's percentage ownership interest in the Company." (*Id.*)  These were false statements intended to deceive the shareholders into approving Defendants' undisclosed plan to wipe out the preferred shareholders through the Reverse Stock Split.  (*Id.* at ¶ 35.)  This is not speculation on Plaintiffs' part:  MoneyLion's "CEO Choubey and CFO Correia confirmed in [a June 8, 2023] virtual meeting that Defendants' purpose in effecting the Reverse Stock Split at the 1-for-30 ratio was to trigger the Automatic Conversion provision and, thereby, alter the rights of the Series A Preferred shareholders under the Certificate." (*Id.* at ¶ 41.)

The Reverse Stock Split procured by the false Proxy Statement took place on April 24, 2023, and on May 26, 2023—almost exactly after the 30 days provided for in the Certificate of Designations—Defendants invoked the Automatic Conversion.  (*Id.* at ¶¶ 39, 44.)  Notably, the

share price manufactured by the Reverse Stock Split ($10.77, up from $0.3662 prior to the split) was just high enough for Defendants to invoke the Automatic Conversion as they planned. *(Id.* at ¶ 42.)

The Certificate of Designations gave Plaintiffs additional protections against the contravention of their rights, but Defendants disregarded those protections as well.  For example, Section 12(b)(i) of the Certificate of Designations required a separate vote of the preferred shareholders if their rights were to be altered in a way that would adversely affect them.  (*Id.* at ¶ 49.)  Defendants failed to secure this vote, and they similarly failed to use any independent process to address the conflicts of interest of the Individual Defendants.  (*Id.* at ¶¶ 50-51.)

After MoneyLion thwarted Plaintiffs' efforts to inspect books and records under 8 Del. Code § 220 (*id.* at ¶ 53), Plaintiffs brought this action on July 27, 2023, asserting:  (1) violation of Section 14(a) of the Exchange Act of 1934 against all Defendants (Count I); (2) breach of fiduciary duties against the individual Defendants (Count II); (3) breach of contract against all Defendants (Count III); and (4) declaratory judgment against all Defendants (Count IV).

## **ARGUMENT**

### I.   **LEGAL STANDARD.**

On a motion to dismiss under Rule 12(b)(6), the court must "accept[] all factual allegations as true and draw[] all reasonable inferences in favor of the plaintiff."  *N.J. Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC*, 709 F.3d 109, 119 (2d Cir. 2013).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).  "This standard is met 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'"  *Buonasera v. Honest Co., Inc.*, 208 F. Supp. 3d 555, 560 (S.D.N.Y. 2016) (quoting *Ashcroft*, 556 U.S. at 678).

**II.**      **THE COMPLAINT PLEADS A CLAIM UNDER § 14(A) OF THE EXCHANGE ACT (COUNT I).**

Section 14(a) of the Exchange Act (15 U.S.C. § 78n) and Rule 14a-9 (17 C.F.R. § 240.14a-9) render unlawful proxy statements containing false statements.[2] "To state a claim under Section 14(a), a plaintiff must allege that '(1) a proxy statement contained a material misstatement or omission, which (2) caused plaintiff['s] injury, and (3) that the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction.'" *McIntosh v. Katapult Holdings, Inc.*, 2023 WL 5049044, at *8 (S.D.N.Y. Aug. 8, 2023).

The Complaint amply meets each element.  It alleges that Defendants' March 31, 2023 Proxy Statement contained false statements, including that "[t]he Reverse Stock Split is not intended to modify the rights of existing stockholders in any material respect[,]" and that "the Reverse Stock Split will affect all stockholders uniformly and will not affect any stockholder's percentage ownership interest in the Company." (Compl. at ¶ 34.)  The Complaint alleges that Defendants knew these statements were false, since they arranged the Reverse Stock Split for the purpose of triggering the Automatic Conversion to strip Plaintiffs of their rights.  (*Id.* at ¶ 35.)

The Complaint also offers specific factual allegations backing up these assertions:  *first*, Defendants set the Reverse Stock Split ratio so as to just barely exceed the $10 trigger of the Automatic Conversion, pumping MoneyLion's share price from $0.3662 to $10.77 after the split. (*Id*. at ¶ 42.)  *Second,* the ratio of the split vastly exceeded any reasonable commercial need of the Company, such as to maintain a share price above $1 for New York Stock Exchange listing purposes.  (*Id.* at ¶¶ 66-67.)  *Third*, as to timing, the Automatic Conversion was conducted almost

---

[2] The "broad remedial purpose" of Rule 14a–9 "is not merely to ensure by judicial means that the transaction, when judged by its real terms, is fair and otherwise adequate, but to ensure disclosures by corporate management in order to enable the shareholders to make an informed choice." *TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. 438, 448 (1976).

immediately after the 30-day window expired.  (*Id.* at ¶¶ 39, 44.)  *Fourth*, and most importantly, Defendants Choubey and Correia (the CEO and CFO of MoneyLion) later admitted that the Reverse Stock Split was engineered specifically to trigger the Automatic Conversion:  "CEO Choubey and CFO Correia confirmed in [a June 8, 2023] virtual meeting that *Defendants' purpose in effecting the Reverse Stock Split at the 1-for-30 ratio was to trigger the Automatic Conversion provision and, thereby, alter the rights of the Series A Preferred shareholders under the Certificate*."  (*Id.* at ¶ 41 (emphasis added).)  In sum, Plaintiffs offer both direct and inferential facts to show that Defendants' plan and purpose was to trigger the Automatic Conversion.

The Complaint amply alleges facts showing a violation of Section 14(a), as it is clear that the Defendants spoke falsely in the proxy Statement to procure shareholder votes in representing, among other things, that no existing shareholders' rights would be modified and that all shareholders would be affected uniformly.  (*Id.* at ¶ 41.)

A.      **The Complaint Pleads That the Proxy Statement Contained False Statements.**

Defendants contend that the Proxy Statement was not false because the Reverse Stock Split itself did not function to deprive shareholders of rights or unevenly affect any shareholders; rather, the Automatic Conversion did so.  This argument lacks merit.

*First,* Defendants' attempt to divorce the Reverse Stock Split from the Automatic Conversion (Dkt. No. 55, Defendants' Motion to Dismiss ("Br.") at 14-15) fails because Defendants <u>admitted</u> that the Reverse Stock Split was designed, engineered, and intended to wipe out the preferred shareholders by triggering the Automatic Conversion.  (Compl. at ¶ 41.) Defendants intended to take away preferred shareholder rights and impose particular burdens on those shareholders and they were not at liberty to tell the shareholders the exact opposite.  Thus, by telling the shareholders of the Company that their votes on the Reverse Stock Split would not

- 7 -

modify the "rights of existing shareholders in any material respect" or that it would "affect all shareholders uniformly[,]" Defendants were being willfully untruthful.  *See* Proxy Statement at 7. The suggestion that the Defendants meant something other than what they said is no defense, particularly at the motion to dismiss stage.  *See Commodity Futures Trading Comm. V. TFS-ICAP, LLC*, 432 F. Supp. 3d 320, 325 (S.D.N.Y. 2020) ("issues of intent and motive are typically factual inquiries that should not be decided on a motion to dismiss"); *LBBW Luxemburg S.A. v. Wells Fargo Sec. LLC*, 10 F. Supp. 3d 504, 517 (S.D.N.Y. 2014) (same).[3]

 *Second*, Defendants argue that despite having said that no stockholder would lose rights, those reading the Proxy Statement would have understood this "in context" to implicitly mean "no common stockholder" would lose rights.  (Br. at 8.)  But the reference to "Common Stock" two sentences prior to "Reverse Stock Split is not intended to modify the rights of existing stockholders in any material respect"—and in many other places in the Proxy Statement—fatally undermines Defendants' argument.  Clearly Defendants knew how to refer specifically to common stock when they meant to (indeed, it was the common stock that was being split) and, conversely, they refer to "preferred" stock on no fewer than twenty-seven occasions in the Proxy Statement.  (*See generally* Proxy Statement.)  Their much broader references in the challenged statements to "existing stockholders" is not limited to any particular class of stock.  When these sophisticated, well-counseled parties meant to refer to one class of stock, they were explicit in doing so, and they cannot now reasonably ask this Court to pretend Defendants meant something other than what they wrote.  Under the doctrine of *expressio unius est exclusio alterius*, when terms are expressly

---

[3] Defendants suggest that Mr. Correia should be dismissed from the case because the Complaint does not allege that he participated in solicitation of the Proxy Statement.  However, the Complaint alleges that he did so, and that he spoke with Plaintiffs concerning the intent behind it. (Compl. at ¶¶ 41, 67.)  Correia is listed in the Proxy Statement itself among the "Directors and Executive Officers" of the Company.  Proxy Statement at 33.

included in a writing, their exclusion from other provisions within the same writing reflects an intentional omission. *See Assured Guar. Mun. Corp. v. UBS Real Est. Sec., Inc.*, 2012 WL 3525613, at *3 (S.D.N.Y. Aug. 15, 2012) ("[W]hen certain persons or categories are specified in a contract, an intention to exclude all others may be inferred.") (internal quotation omitted).

Defendants' cite to *Furlong Fund LLC v. VBI Vaccines, Inc.*, 2016 WL 1181710, at *3 (S.D.N.Y. Mar. 25, 2016), to suggest that no statement can be misleading under Section 14(a) if it is susceptible to a different interpretation in light of some separate text. That is not the law. Even if Defendants' hindsight rewrite of their own words were plausible, "the fact that a proxy solicitation can lend itself to more than one plausible interpretation does not merit dismissal at the Rule 12(b)(6) stage." *Enzo Biochem, Inc. v. Harbert Discovery Fund, LP*, 2021 WL 4443258, at *11 (S.D.N.Y. Sept. 27, 2021) (citing *Koppel v. 4987 Corp.*, 167 F.3d 125, 133 (2d Cir. 1999)). Indeed, "[s]ome statements, although literally accurate, can become, through their context and manner of presentation, devices which mislead investors. For that reason, the disclosure required by the securities laws is measured not by literal truth, but by the ability of the material to accurately inform rather than mislead prospective buyers." *McMahan & Co. v. Warehouse Entertainment, Inc.*, 900 F.2d 576, 579 (2d Cir. 1990); *see also Greenapple v. Detroit Edison Co.*, 618 F.2d 198, 205 (2d Cir. 1980) (where method of presenting information obscures or distorts significance of material facts, it is misleading). Defendants could easily have left no doubt that their statements in the Proxy concerning the Reverse Stock Split were applicable <u>only</u> to common stock, particularly since they were not hesitant to refer to specific classes of stock throughout the document. By suggesting that a shareholder might hypothetically have parsed out a different connotation, Defendants underscore that their challenged statement, which should have been crystal-clear, was in fact misleading.

*Third,* Defendants quickly move on from this losing argument to contend that even if the challenged statements were false, Plaintiffs have not established that they were false "at the time that [they were] made." (Br. at 10.) This, again, misreads the Complaint, which alleges that the statements "were untrue at the time they were made" because the Reverse Stock Split "was intended to wipe out the value of the preferred shareholders . . . . Indeed, that was the primary purpose of the Reverse Stock Split, which [Defendants] Choubey and Correia have since conceded…." (Compl. at ¶ 35.) The fact that the Reverse Stock Split had taken place two months prior to the statements of Choubey and Correia, confirming their earlier true intent, is irrelevant.

Defendants next argue that the MoneyLion Board of Directors (the MoneyLion "Board") had not yet determined whether to effect the Reverse Stock Split at the time the Proxy was issued, "much less that the Board had chosen a specific ratio for any such reverse split." (Br. at 10-11.) This, of course, is an assertion of purported (and disputed) fact, and it cites no source, much less anything in the Complaint or the Proxy Statement; thus, it is not properly before the Court on this motion. *See Doe v. Columbia Univ.*, 831 F.3d 46, 48 (2d Cir. 2016) ("On a motion under Rule 12(b)(6) to dismiss a complaint for failure to state a claim, the only facts to be considered are those alleged in the complaint."). In any event, the assertion is flatly contradicted by the Complaint and the facts it alleges, as noted above. It is also contradicted by the prompt timing and Board-chosen ratio of the split—both specifically arranged to immediately wipe out the preferred shareholders.[4]

Finally, Defendants argue that it was hypothetically possible that MoneyLion's stock could have fared so poorly after the Reverse Stock Split that MoneyLion still might not have hit the

---

[4] Defendants' citation to *Goldberger v. Baker*, 442 F. Supp. 659, 667 (S.D.N.Y. 1977), advances no ball here. There, the Court held it would "undoubtedly [have been] misleading" to include in a proxy statement a specific arithmetic prediction of the future value of proposed stock options based on the likely-to-change existing value of common stock. Here, Defendants admitted that they arranged the Reverse Stock Split specifically to hit the Automatic Conversion trigger, so they knew at the time of the Reverse Stock Split what the ratio had to be. The failure to disclose that, combined with explicit assurances that no stockholder would be affected adversely, renders the Proxy Statement false.

sustained $10/share trigger for the Automatic Conversion for the necessary 20 of 30 trading days thereafter.  (Br. at 11.)  Maybe so, but (a) that is not what happened, and (b) that is not what Defendants intended or contemplated.  Defendants manufactured the Reverse Stock Split to trigger the Automatic Conversion and wipe out the rights of preferred stockholders.  The possibility that circumstances might have overtaken Defendants' best efforts does not render any less false their assurances that no shareholder's rights would be affected and that all shareholders would be affected equally when they knew those statements were untrue when made.  Put another way, that the outcome of Defendants' plan was not guaranteed did not make true their statements to shareholders that there was no such plan.  Defendants' argument has neither logical merit nor basis in existing case law, as Defendants concede by failing to cite to any.

### B.    Plaintiffs Have Sufficiently Pled Materiality and Causation.

Defendants contend that even if false, the challenged statements were not material.  As a threshold matter, this argument cannot be resolved on a motion to dismiss.  *See*, *e.g., In re Fuwei Films Sec. Litig.*, 634 F. Supp. 2d 419, 441-42 (S.D.N.Y. 2009) ("granting Plaintiff the inferences to which he is entitled, the Court cannot find, as a matter of law at this stage of these proceedings, that a reasonable investor could not find this information 'significant' to his or her investment decision").  Indeed, Defendants bear the burden of showing that each challenged statement was not important to a reasonable shareholder in deciding how to vote.  *United Paperworks Int'l Union v. Int'l Paper Co.*, 985 F.3d 1190, 1198 (2d Cir. 1993) ("A fact is material for purposes of Rule 14a–9 'if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote.' Once the proxy statement purport[s] to disclose the factors considered [by the board of directors] ..., there [i]s an obligation to portray them accurately.'")  Defendants have not met and cannot possibly meet this burden.

Referring to the "total mix of information" standard typical of this Court's analysis of

- 11 -

materiality, Defendants argue that shareholders had access to the Certificate of Designations and were presumably aware of MoneyLion's stock price at the time the Reverse Stock Split was proposed; therefore, shareholders "could have speculated for themselves" as to its consequences. (Br. at 13.) That contention does not align with how courts engage in the "total mix of information" calculus. The Second Circuit has made clear that shareholders are entitled to have at their disposal a "total mix of information" that includes factors "additional" to that which would otherwise be provided by the Proxy Statement. *Mendell v. Greenberg*, 927 F.2d 667, 674 (2d Cir. 1990), *amended*, 938 F.2d 1528 (2d Cir. 1990). As this Court has elaborated,

> A proxy statement should honestly, openly and candidly state all the material facts, making no concealment of the purposes for the proposals it advocates. Section 14(a) is satisfied "[o]nly when the proxy statement fully and fairly furnishes all the objective material facts as to enable a reasonably prudent stockholder to make an informed investment decision is the federal purpose in the securities laws served."

*Fresno Cnty. Emps.' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 561 (S.D.N.Y. 2017) (quoting *Mendell*, 927 F.2d at 670) (internal citation omitted).

While shareholders might have understood the Automatic Conversion mechanism—although this is merely conjecture on an undeveloped record—none would have "speculated" that the Reverse Stock Split would trigger it, because Defendants' statements negated that possibility. Having been told by Defendants that the Reverse Stock Split would not "modify rights of existing shareholders in any material respect" and would "affect all shareholders uniformly[,]" (Proxy Statement at 7) no reasonable shareholder would understand that it was in fact intended to eliminate the rights of preferred shareholders. The "total mix of information" was critically altered by Defendants' clear statement of intention as to the Reverse Stock Split. *See, e.g., United Paperworkers Int'l Union*, 985 F.2d at 1199-1201 (finding that poorly described or omitted

information that would have influenced shareholders' decisions was material).[5]

A statement is material "if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." *United Paperworkers Int'l Union*, 985 F.2d at 1198. It would have been important to the shareholders of MoneyLion to know that their vote was being sought for the purpose of stripping rights from a group of other shareholders, which would invite not only exposure to liability, but also the adverse publicity of a lawsuit, in addition to the alienation of a group of preferred investors that included well-known financial institutions. It is simply impossible, at the motion to dismiss stage, to conclude that no reasonable investor would have cared about these significant legal, reputational and publicity risks, particularly given that MoneyLion is a growth-stage company and such risks could seriously and adversely affect its ability to access capital. *In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 646 (S.D.N.Y. 2017) ("the determination of whether a false or misleading statement is material requires courts to engage in a fact-specific inquiry that depends on all relevant circumstances, and … materiality is a mixed question of law and fact") (internal quotations omitted).

Defendants' causation argument (Br. at 14-15) fares no better.[6] Defendants urge the Court to wear blinders and conclude that Plaintiffs' injuries are a function of the terms of the Automatic Conversion provision of the Certificate of Designations, not Defendants' conduct. But the

---

[5] Defendants also argue that their undisclosed plan to trigger the Automatic Conversion provision through the Reverse Stock Split is immaterial, citing to *Lewis v. Potlatch Corp.,* 716 F. Supp. 807, 809 (S.D.N.Y. 1989), for the proposition that a Section 14(a) claim is not sustainable where "all of the relevant facts which a reasonable shareholder would need to make a decision on a proposed corporate action are disclosed." But as previously described, Defendants failed to provide the "total mix" of facts that would have been relevant to shareholders. Defendants' argument is inapposite except to the extent that it demonstrates Defendants' belief that their decision to conceal their actual intent in effecting the Reverse Stock Split is somehow not actionable.

[6] "To plausibly allege loss causation under Section 14(a), a plaintiff must satisfy 'Rule 8 notice pleading standards,' which requires "some indication of the loss and the causal connection that the plaintiff has in mind.'" *Enzo Biochem*, 2021 WL 4443258, at *9 (quoting *Bricklayers & Masons Loc. Union No. 5 Ohio Pension Fund v. Transocean Ltd.*, 866 F. Supp. 2d 223, 245 (S.D.N.Y. 2012)).

Certificate of Designations functioned to Plaintiffs' detriment only as a result of Defendants having artificially manipulated MoneyLion's common stock price—an eventuality not contemplated in the Certificate of Designations.  Plaintiffs have therefore sufficiently pled causation at this stage by way of attributing to Defendants' an intent to mislead in the furtherance of a foreseeable consequence—namely, wiping out the preferred shareholders.  *See, e.g.*, *Erickson v. Jernigan Cap., Inc.*, 2022 WL 3028627, at *4 (S.D.N.Y. Aug. 1, 2022) (finding plaintiffs adequately alleged lower share price was foreseeable consequence of key information omitted from proxy disclosures).

Nor is the causation chain here in any way "attenuated" as Defendants argue.  (Br. at 17.)  While it is true that market forces might have prevented Defendants' scheme from coming to fruition by driving the MoneyLion share price below the $10/share trigger, that was neither what happened nor what Defendants intended.  The Complaint alleges that Defendants contrived to strip Plaintiffs of their preferred rights.  (Compl. at ¶ 46.)  Central to that contrivance was a material and intentional effort to mislead voting shareholders so as to secure authorization for the Reverse Stock Split.  (*Id.* at ¶ 49.)  The Reverse Stock Split was brought into existence to trigger the Automatic Conversion feature of the Certificate of Designations and its ratio and timing confirm that was its sole function, which was promptly implemented.  (*Id.* at ¶ 41.)  This lawsuit exists because Defendants' plan worked effectively and precisely as designed to trigger the intended and necessarily foreseeable outcome of stripping Plaintiffs of their preferred rights.  The contention that Defendants did not "cause" Plaintiffs' injury because their machinations involved several steps finds no support in the law, which holds that reasonable foreseeability is the standard for causation.  *See, e.g.*, *Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171, 186 (2d Cir. 2001) (loss causation "has often been described as proximate cause, meaning that the damages suffered by

plaintiff must be a foreseeable consequence of any misrepresentation or material omission").

Defendants' reference to transaction causation does not appear to be a serious argument. Defendants suggest that Plaintiffs must offer proof at the pleading stage that the shareholder vote would have gone differently. Not so. *See Koppel*, 167 F.3d at 133 (finding that "[a] plaintiff, of course, need only *allege*, not *prove*, sufficient facts to survive a motion to dismiss"). Plaintiffs have offered allegations to show that Defendants lied in the Proxy Statement to procure the shareholder vote, and the reasonable inference here is that they did so because they believed they needed to lie in order to procure the vote. It is similarly reasonable to infer that shareholders in a fully-informed vote would have cared about the liability, publicity and fundraising implications of Defendants' overbearing scheme.[7] There is no tenable argument that the vote procured by the Proxy Statement, as a matter of law, would have been unchanged had Defendants been truthful.

## III. THE COMPLAINT PLEADS A CLAIM FOR BREACH OF FIDUCIARY DUTY.

Defendants mistakenly assert that the "crux of Plaintiffs' fiduciary duty claim is that Defendants allegedly acted to deprive Plaintiffs of their contractual rights in the Certificate of Designations, which were unique to the Preferred Stock." (Br. at 20.) Not so. Defendants breached their duty of candor to all shareholders by procuring an unauthorized transaction via falsehoods and material omissions. *In re Mindbody, Inc., S'holder Litig.*, 2023 WL 2518149, at *31 n.494 (Del. Ch. Mar. 15, 2023) (finding that "[the duty of candor] represents nothing more than the well-recognized proposition that directors of Delaware corporations are under a fiduciary

---

[7] There is no inconsistency here between the existence of the Automatic Conversion and the Proxy Statement's false contentions that the Reverse Stock Split would not adversely affect any shareholders. The two can be harmonized simply by inferring that the Reverse Stock Split would be exercised so as not to trigger the conversion (as the Proxy Statement indicated). But even if there had been an inconsistency, this would not warrant dismissal. "The point of a proxy statement, after all, should be to inform, not to challenge the reader's critical wits. Only when the inconsistency would exhaust the misleading conclusion's capacity to influence the reasonable shareholder would a § 14(a) action fail on the element of materiality." *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1097-98 (1991).

duty to disclose fully and fairly all material information within the board's control when it seeks

shareholder action") (quoting *Stroud v. Grace*, 606 A.2d 75, 84 (Del. 1992)).  Further, Defendants

personally "stood to benefit from the Automatic Conversion" they arranged (Compl. at ¶ 69.), but

failed to engage in an independent process to insulate against such conflicts.  (*Id.* at ¶ 48.)  Those

breaches are actionable.  As the Delaware Chancery Court recently held:

> One scenario that triggers a duty of disclosure is when directors ask
> stockholders to take action. If directors place a matter before the
> stockholders for a vote, then the directors have a duty to disclose all
> information material to that vote. Likewise, if directors propose a
> transaction that presents stockholders with an investment decision,
> such as a self-tender offer by the corporation or an affiliate, then the
> directors have a duty to disclose all information material to that
> investment decision.

*Cygnus Opportunity Fund, LLC v. Washington Prime Grp., LLC*, 2023 WL 5113279, at *7 (Del.

Ch. Aug. 9, 2023); *Zirn v. VLI Corp.*, 681 A.2d 1050, 1056 (Del. 1996) (holding that under

Delaware law, a fiduciary that chooses to speak must do so candidly and completely).  *See In re*

*Pattern Energy Grp. Inc. S'holders Litig.*, 2021 WL 1812674, at *71-74 (Del. Ch. May 6, 2021)

(holding that plaintiff adequately alleged that individual director defendant breached the duty of

loyalty by disseminating a false and misleading proxy statement); *see also In re Columbia Pipeline*

*Grp., Inc.*, 2021 WL 772562, at *57 (Del. Ch. Mar. 1, 2021) (finding that potential benefits

conferred by the proposed merger supported a reasonable inference that defendants' failure to

disclose information in the proxy statement resulted from a breach of loyalty).  As discussed above,

Defendants breached these duties.

　　　　Contrary to Defendants' contentions, courts have explicitly rejected the notion that

preferred shareholders "may seek to hold directors liable [only] for violation of explicit contractual

duties."  *Fletcher Int'l, Ltd. v. ION Geophysical Corp.*, 2010 WL 2173838, at *7-8 (Del. Ch. May

28, 2010).  Delaware law is clear that while certain duties to preferred shareholders are created by

contract, preferred shareholders may still sue for breaches of fiduciary duties to <u>all</u> shareholders. *See, e.g., Jackson Nat'l Life Ins. Co. v. Kennedy*, 741 A.2d 377, 386 (Del. Ch. 1999) (finding that "[a] corporation's directors 'are fiduciaries for the [p]referred stockholders, whose interests they have a duty to safeguard, consistent with the fiduciary duties owed by those directors to [the corporation's] other shareholders and to [the corporation] itself'") (quoting *Eisenberg v. Chicago Milwaukee Corp.*, 537 A.2d 1051, 1062 (Del. Ch. 1987)).  That Plaintiffs happen to have been preferred shareholders does not relieve Defendants of the general, candor and loyalty-based fiduciary duties they owed to Plaintiffs and all other MoneyLion shareholders.  *See Frederick Hsu Living Tr. v. ODN Holding Corp.*, 2017 WL 1437308, at *21 (Del. Ch. Apr. 14, 2017) (finding that preferred shareholders are owed the same fiduciary duties as common shareholders except where the duty invoked is specific or limited to the interests of the preferred shareholders).

The fiduciary duties at issue here were owed coextensively to common and preferred shareholders—all shareholders were entitled to full disclosure in the Proxy Statement of the Board's intent to effectuate the Reverse Stock Split as a means of triggering the Automatic Conversion, and to a disinterested process.  *See id*.  Therefore, Defendants' motion to dismiss Plaintiffs' claim for breach of fiduciary duty should be denied.

## IV.   THE COMPLAINT PLEADS A CLAIM FOR BREACH OF CONTRACT.

Plaintiffs have alleged two distinct breaches by Defendants of the Certificate of Designations.  *First*, as the Complaint alleges, in seeking to undertake the Reverse Stock Split for the purpose of triggering the Automatic Conversion, Defendants did not solicit the required separate class vote or consent of Series A Preferred shareholders.[8]  (Compl. at ¶¶ 49-50.)  *Second*,

---

[8] The Certificate of Designations provides in § 12(b)(i) that:

> [T]he vote or consent of the Holders of a majority of the shares of Series A Preferred Stock outstanding at such time, voting together as a separate class, given in person or by proxy. . . will be necessary for, directly or indirectly, whether or not such approval is required pursuant to the DGCL **. . . any amendment,**

- 17 -

Defendants breached the implied covenant of good faith and fair dealing by procuring the trigger of the Automatic Conversion by artificial means and for the improper purpose of clawing back Plaintiffs' consideration under the Certificate of Designations.  (*See id*. at ¶ 59.)

Defendants argue that triggering of the Automatic Conversion did not amount to an alteration of Plaintiffs' rights.  But for all practical purposes, it did, as alleged in the Complaint. Specifically, Plaintiffs have alleged that Defendants knew and intended that securing permission for and effectuating the Reverse Stock Split would function to eliminate Plaintiffs' preferred rights as guaranteed by the Certificate of Designations, thereby requiring a separate class vote that Defendants failed to solicit.  (*Id*. at ¶¶ 48-50, 59, 75.)[9]

By taking action specifically to trigger the Automatic Conversion, Defendants also breached the implied covenant of good faith and faith dealing.  The implied covenant of good faith and fair dealing inheres in every contract and "requires a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the bargain."  *Am. Healthcare Admin. Servs., Inc. v.*

---

**waiver, alteration or repeal (whether by merger, consolidation or otherwise) of any provision of the Certificate of Incorporation (including this Certificate of Designations) or Bylaws that would have an adverse effect on the rights, preferences, privileges or voting power of the Series A Preferred Stock** (for the avoidance of doubt, neither (i) an adverse effect on the rights, preferences, privileges or voting power of the Common Stock or (ii) the authorization or issuance of any Junior Stock of the Company, shall, in either case, be deemed to be an adverse effect on the rights, preferences, privileges or voting power of the Series A Preferred Stock)….

(emphasis added.)

[9] In *Greenmont Cap. Partners I, LP v. Mary's Gone Crackers, Inc.*, 2012 WL 4479999 (Del. Ch. Sept. 28, 2012), cited by Defendants, a majority of the preferred shareholders voted in favor of conversion of preferred stock into common stock, as required by the Certificate of Incorporation.  A holder of a particular class of preferred stock asserted that the consent of a majority of that particular class was required to effectuate the subsequent change to the certificate of incorporation by which reference to preferred stock was eliminated.  *Id.* at *2-3.  The Court of Chancery disagreed, finding that the conversion did not alter the rights of the dissenting shareholder, since the certificate did not grant that class of shareholder the right to vote separately on the conversion.  *Id.* at *4.  But unlike in *Greenmont*, where the shareholder sought to challenge a conversion that the preferred shareholders supported and which followed the precise mechanisms agreed to by the parties in the certificate in question, Defendants here sought to deprive Plaintiffs of their protections by triggering a conversion *without* a vote of the preferred shareholders, and by means of false statements to the shareholders generally.

*Aizen*, 285 A.3d 461, 479 (Del. Ch. 2022); *accord Dalton v. Educ. Testing Serv.*, 87 N.Y.2d 384, 389, (N.Y. 1995) (finding that "neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract."). "[P]arties are liable for breaching the covenant when their conduct frustrates the overarching purpose of the contract by taking advantage of their position to control implementation of the agreement's terms." *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 442 (Del. 2005) (internal quotation marks and citation omitted).

The Certificate of Designations provided that Plaintiffs would enjoy preferred shareholder rights unless and until MoneyLion shares reached an agreed-upon market price for an agreed-upon duration. This provision is predicated on the notion that those prices would move based on natural market fluctuations, not some self-interested manipulation by Defendants. It was a classic exercise of bad faith for Defendants to employ the false statements and improper conduct previously discussed to procure the Reverse Stock Split for the specific purpose of manipulating the MoneyLion share price to the contractual trigger, thereby eliminating the rights Defendants had granted Plaintiffs in the Certificate of Designations.

Defendants nevertheless argue that "[w]here, as here, 'the contract at issue expressly addresses a particular matter, an implied covenant claim respecting that matter is duplicative and not viable,'" citing to *Edinburgh Holdings, Inc. v. Educ. Affiliates, Inc.*, 2018 WL 2727542, at *9 (Del. Ch. June 6, 2018). Even if Defendants had discretion to engage in a reverse stock split for legitimate commercial reasons, they were not at liberty to do so for the purpose of clawing back the promises they gave to Plaintiffs, as the Complaint alleges. The Certificate of Designations accounted for how the MoneyLion share price would move as a result of naturally-occurring market fluctuations. What it did not account for was Defendants' manipulation of that price

movement through misconduct and a false Proxy Statement.  That misconduct constitutes the "gap in the Certificate [at issue] arising from an unanticipated development…" *Cedarview Opportunities Master Fund, L.P. v. Spanish Broad. Sys., Inc.*, 2018 WL 4057012, at *14 (Del. Ch. Aug. 27, 2018).

Plaintiffs' claim for breach of the implied covenant of good faith and fair dealing is therefore sufficiently pled at this stage and Defendants' motion should be denied.

## V.   DECLARATORY JUDGMENT IS NOT NEEDED WHERE DEFENDANTS CONCEDE THE VALIDITY AND ENFORCEABILITY OF THE PARTIES' CONTRACT.

Defendants appear to agree that the Certificate of Designations is a valid, enforceable contract, which governs Defendants' obligations with respect to obtaining a vote of the preferred shareholders relating to the Reverse Stock Split.  Assuming that position holds, Plaintiffs therefore do not need to pursue their declaratory judgment claim (Count IV).

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants' Motion to Dismiss.

Dated: December 6, 2023

Respectfully submitted,

*/s/ Jeffrey A. Simes*
Jeffrey A. Simes
Alexander Talel
GOODWIN PROCTER LLP
620 Eighth Avenue
New York, NY 10018
Tel.: (212) 813-8800
Fax: (212) 355-3333
jsimes@goodwinlaw.com
atalel@goodwinlaw.com

*Attorneys for Plaintiffs*
*Canaan X L.P., Canaan XI L.P., F-Prime Capital Partners Tech Fund LP, GreatPoint Ventures Innovation Fund II, L.P., and MassMutual Ventures US II LLC.*

- 20 -

## <u>CERTIFICATE OF SERVICE</u>

I, Jeffrey A. Simes, hereby certify that on December 6, 2023, I caused the foregoing document to be served on Defendants' counsel by ECF and electronic mail.


*/s/ Jeffrey A. Simes*
Jeffrey A. Simes
