UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
CANAAN X L.P., et al.,

                      Plaintiffs,                                    23-cv-6550 (PKC)

      -against-                                           OPINION AND
                                                                          ORDER

MONEYLION INC., et al.,

                      Defendants.
-----------------------------------------------------------x

CASTEL, U.S.D.J.

        The Court briefly summarizes the backdrop to plaintiffs' claim under section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and defendants' motion to dismiss that claim. MoneyLion Inc. ("MoneyLion") acquired Even Financial Inc. (Complaint, ECF 1, ¶ 27). Plaintiffs owned shares of Even Financial, Inc., and received MoneyLion Series A Preferred Convertible Stock (the "Preferred Stock") as part of the acquisition. (Id.). The Preferred Stock's Certificate of Designations provided that each share of Preferred Stock would be converted into MoneyLion's Class A Common Stock (the "Common Stock") if MoneyLion's stock price "equal[ed] or exceed[ed] $10.00 on any twenty (20) Trading Days . . . within any consecutive thirty (30) Trading Day period." (Id. ¶ 29).

        Unrelatedly, the New York Stock Exchange (the "NYSE") notified MoneyLion that its average closing price for its Common Stock had fallen below the $1.00 minimum requirement for continued listing on the NYSE and that it had six months to regain compliance with the minimum share price requirement. (Id. ¶¶ 65-66, ECF 56-1, at 14). In an effort to increase its stock price, MoneyLion's Board of Directors filed a March 31, 2023 Proxy

1

Statement with the United States Securities and Exchange Commission that invited MoneyLion's shareholders to grant the Board discretion to effectuate a Reverse Stock Split at ratio between 1-for-2 and 1-for-30. (Id. ¶ 33). MoneyLion's shareholders voted to authorize the Reverse Stock Split, and on April 24, 2023, within the six-month window set by the NYSE, MoneyLion's Board effectuated the Reverse Stock Split at a 1-for-30 ratio. (Id. ¶¶ 37, 39). MoneyLion's stock price began trading above $10.00, and on May 26, 2023, the Preferred Stock's Automatic Conversion provision was triggered. (Id. ¶ 44). As a result, all shares of the plaintiffs' Preferred Stock were converted into MoneyLion's Common Stock. (Id. ¶ 46).

Plaintiffs—Canaan X L.P., Canaan XI L.P., F-Prime Capital Partners Tech Fund LP, GreatPoint Ventures Innovation Fund II, LP, and MassMutual Ventures US II LLC— now bring this action against MoneyLion, Inc., all directors of MoneyLion, and its Chief Financial Officer, Richard Correia. (Id. ¶¶ 11-21). Plaintiffs allege that the Proxy Statement contained materially false or misleading statements, in violation of section 14(a) of the Exchange Act (Count I). Plaintiffs also assert three state law claims: a breach of fiduciary duty claim against the individual defendants (Count II), a breach of contract claim against all defendants (Count III), and a judgment declaring (Count IV) "that (1) under the Certificate, the Reverse Stock Split required the separate class vote or consent of Series A Preferred shareholders; and (2) because the aforementioned vote or consent did not occur, the vote that occurred was improper, and therefore MoneyLion and its Board violated the Certificate." (Id. ¶ 82).

Defendants now move to dismiss the section 14(a) claim for failure to state a claim, Rule 12(b)(6), Fed. R. Civ. P. With respect to the remaining state-law claims, they urge the Court to decline to exercise supplemental jurisdiction, or in the alternative, to dismiss them for failure to state a claim. For reasons that will be explained, the Court concludes that plaintiffs

have failed to plausibly allege a violation of section 14(a) of the Exchange Act and declines to exercise supplemental jurisdiction over the remaining state-law claims.

THE ALLEGATIONS OF THE COMPLAINT

The Court accepts the allegations of the Complaint as true for the purposes of the motion and draws all reasonable inferences in favor of plaintiffs as the non-movants. Freedom Holdings, Inc. v. Spitzer, 357 F.3d 205, 216 (2d Cir. 2004). The Court also considers the content of the Proxy Statement (ECF 56-1) which is incorporated by reference into the Complaint. Chambers v. Time Warner, Inc., 282 F.3d 147, 152-53 (2d Cir. 2002).

MoneyLion is a publicly-traded corporation listed on the NYSE that provides services relating to banking and finance. (Complaint ¶ 26). MoneyLion acquired Even Financial on February 17, 2022. (Id. ¶ 27). Plaintiffs were shareholders of Even Financial who received shares of MoneyLion Series A Preferred Convertible Stock as part of the transaction. (Id.). Holders of the Preferred Stock were entitled to rights, privileges, and protections that holders of MoneyLion's Common Stock did not enjoy, such as an annual dividend and a liquidation preference. (Id. ¶ 28).

Section Eight of the Certificate of Designations for the Preferred Stock contained an "Automatic Conversion" provision. It provided that the Preferred Stock would be converted into MoneyLion's Common Stock as follows:

> Each share of Series A Preferred Stock shall automatically be converted (an "Automatic Conversion"),without any further action by the Holder of such share of Series A Preferred Stock, into a number of shares of Common Stock equal to the Conversion Rate if the Parent Conversion Stock Price equals or exceeds $10.00 on any twenty (20) Trading Days (which may be consecutive or nonconsecutive) within any consecutive thirty (30) Trading Day period that ends no earlier than the last day of the Restricted Period

for such share of Series A Preferred Stock (an "Automatic Conversion Event").

Id. ¶ 29.

The Complaint alleges that "[o]ver the past few years," the price of MoneyLion's Common Stock had "fallen considerably." (Id. ¶ 30). On November 23, 2022, the NYSE notified MoneyLion that the average closing price of its Common Stock was less than $1.00 per share over a consecutive thirty-day trading period. (ECF 56-1, at 14). MoneyLion had six months to regain compliance with the minimum share price requirement or face the risk its stock would be delisted from the NYSE. (Id.). To increase MoneyLion's stock price, defendants issued a March 31, 2023 Proxy Statement (the "Proxy Statement") seeking shareholder approval for an amendment to the Fourth Amended and Restated Certificate of Incorporation to authorize a Reverse Stock Split. (Complaint, ¶¶ 31-32). The amendment, according to the Proxy Statement, would permit the Board to authorize a Reverse Stock Split of the MoneyLion Common Stock accompanied by a corresponding reduction in the authorized shares of Common Stock. (Id. ¶ 33; ECF 56-1, at 3). The amendment authorized the Board to select a Reverse Stock Split range between 1-for-2 and 1-for-30. (Id.).

The Proxy Statement explained that the "primary goal" of the Reverse Stock Split was "to increase the per share market price of the Class A Common Stock to meet the minimum per share price requirement for continued listing on the [NYSE]." (ECF 56-1, at 13). "The Reverse Stock Split is not intended to modify the rights of existing stockholders in any material respect." (Id.). Elsewhere, the Proxy Statement described the "Effects of the Reverse Stock Split on Outstanding Shares" as follows: "the Reverse Stock Split will affect all stockholders uniformly and will not affect any stockholder's percentage ownership interest in the Company, except to the extent that the Reverse Stock Split would result in fractional shares in the Reverse

Stock Split . . . ." (ECF 56-1, at 15). The Complaint alleges the Proxy Statement's statement of "primary goals" is false and misleading in stating that "[t]he Reverse Stock Split is not intended to modify the rights of existing stockholders in any material respect" and its description of "Effects" is false and misleading in stating that "the Reverse Stock Split will affect all stockholders uniformly and will not affect any stockholder's percentage ownership interest in the Company . . . ." (Complaint ¶ 34). According to plaintiffs, these statements indicated that the Series A Preferred Convertible Stock would not be affected by the Reverse Stock Split, and the Proxy Statement omitted any statement explaining the potential consequences of the Reverse Stock Split for the Preferred Stockholders. (Id. at ¶¶ 34, 37).

The Complaint further alleges that, upon information and belief, "MoneyLion's directors and officers did not undertake an independent process to determine whether effecting the Reverse Stock Split in a manner that altered the rights of a class of shareholders was in the best interest of the company." (Id. ¶ 48). It further alleges that the vote authorizing the Reverse Stock Split contravened MoneyLion's corporate documents by "directly undermining the voting rights of the Series A Preferred shareholders" without a separate class vote or consent. (Id. ¶¶ 49-50).

At a Special Meeting held on April 19, 2023, MoneyLion shareholders voted in favor of the measures proposed in the Proxy Statement. (Id. ¶ 37). On April 21, 2023, MoneyLion's Board approved the Reverse Stock Split, and on April 24, 2023, effected the Reverse Stock Split at a 1-for-30 ratio. (Id. ¶¶ 38-39). MoneyLion's Common Stock price per share at the close of the market on April 24, 2023 traded at $0.3662. (Id. ¶ 42). Its opening price per share on April 25, 2023 was $10.77. (Id.). On May 26, 2023, after the price per share of MoneyLion's Common Stock had equaled or exceeded $10.00 for the twentieth trading day

within a consecutive thirty-day trading period, defendants triggered the Automatic Conversion provision. (Id. ¶ 44). All shares of the Preferred Stock were converted into newly issued MoneyLion Common Stock. (Id.).

At a June 8, 2023 virtual meeting between defendants and some investors, the Complaint alleges that CEO Diwakar Choubey and CFO Richard Correia "confirmed . . . that Defendants' purpose in effecting the Reverse Stock Split at the 1-for-30 ratio was to trigger the Automatic Conversion provision." (Id. ¶ 41). As a result of the conversion, "Plaintiffs thereby lost the rights associated with their Series A Preferred Stock." (Id. ¶ 46).

DISCUSSION

To survive a motion to dismiss for failure to state a claim, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corporation v. Twombly, 550 U.S. 544, 570 (2007)). On a motion to dismiss, where "the Proxy [Statement] is incorporated by reference into the complaint, [the Court] may properly take it into account at th[e] motion to dismiss stage." Gray v. Wesco Aircraft Holdings, Inc., 847 F. App'x 35, 38 n.4 (2d Cir. 2021) (summary opinion). Further, in securities fraud actions, the Court may consider documents that are required to be filed and actually have been filed with the SEC. See Kramer v. Time Warner Inc., 937 F.2d 767, 774 (2d Cir. 1991); ATSI Communications, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007).

In assessing a complaint, courts draw all reasonable inferences in favor of the non-movant. See In re Elevator Antitrust Litigation, 502 F.3d 47, 50 (2d Cir. 2997). To the extent the plaintiffs allege "legal conclusion[s] couched as factual allegation[s]," however, the

Court is not bound to accept such statements as true. Drimal v. Tai, 786 F.3d 219, 223 (2d Cir. 2015) (internal quotation omitted). Instead, the court must examine only the well-pleaded factual allegations, if any, "and then determine whether they plausibly give rise to an entitlement to relief." Iqbal, 556 U.S. at 679.

Additionally, "[a]ny complaint alleging securities fraud must satisfy the heightened pleading requirements of the [Private Securities Litigation Reform Act] and Fed. R. Civ. P. 9(b) by stating with particularity the circumstances constituting fraud." ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co., 553 F.3d 187, 196 (2d Cir. 2009). This requires that the Complaint "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1).

I. The Complaint Fails to Plausibly Allege a Claim Under
   Section 14(a) of the Exchange Act for Lack of Materiality

Section 14(a) of the Securities Exchange Act of 1934 bars the dissemination of proxy statements "in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78n(a)(1). Rule 14(a)(9), promulgated by the Securities and Exchange Commission, provides in relevant part that no proxy statement may contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-

9(a). In order to recover under section 14(a), the plaintiffs "must show that (1) a proxy statement contained a material misrepresentation or omission, which (2) caused plaintiffs' injury, and (3) the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction." Bond Opportunity Fund v. Unilab Corp., 87 F. App'x 772, 773 (2d Cir. 2004) (summary order).

Section 14(a) of the Exchange Act "was intended to promote the free exercise of the voting rights of stockholders by ensuring that proxies would be solicited with explanation to the stockholder of the real nature of the questions for which authority to cast his votes is sought." TSC Industries, Inc. v. Northway, Inc., 426 U.S. 438, 444 (1976) (internal quotations omitted). "If full and fair disclosure is made, the wisdom and fairness of the program for which support is solicited are of tangential concern." Kennecott Copper Corp. v. Curtiss-Wright Corp., 584 F.2d 1195, 1199 (2d Cir. 1978). For that reason, "nit-picking should not become the name of the game," and the Court bears in mind that "[f]air accuracy, not perfection, is the appropriate standard." Id. at 1200.

The materiality requirement is "satisfied when a plaintiff alleges a statement or omission that a reasonable investor would have considered significant in making investment decisions." Litwin v. Blackstone Group, L.P., 634 F.3d 706, 717 (2d Cir. 2011) (internal quotation omitted). "Disclosure of an item of information is not required, however, simply because it may be relevant or of interest to a reasonable investor." Resnik v. Swartz, 303 F.3d 147, 154 (2d Cir. 2002). Rather, plaintiff must show "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." TSC Industries, Inc., 426 U.S. at 449. The "total mix" of information made available includes "information already in the public

domain and facts known or reasonably available to the shareholders." United Paperworkers International Union v. International Paper Co., 985 F.2d 1190, 1199 (2d Cir. 1993) (internal quotation omitted). While materiality of an alleged misstatement or omission is normally a question of fact to be decided by the trier of fact, TSC Industries, Inc., 426 U.S. at 450, materiality may be resolved as a matter of law when the information at issue is so obviously unimportant that "reasonable minds could not differ on the question of their importance." Ganino v. Citizens Utilities Co., 228 F.3d 154, 162 (2d Cir. 2000).

    Plaintiffs allege that the Proxy Statement omitted that the purpose and a potential effect of the Reverse Stock Split was to trigger the Automatic Conversion provision and convert the Preferred Stock into Common Stock. The Court assumes without deciding that plaintiffs have plausibly alleged that the Proxy Statement omitted these facts, rendering the statements that "the Reverse Stock Split will affect all stockholders uniformly" and "[t]he Reverse Stock Split is not intended to modify the rights of existing stockholders in any material respect" false or misleading. Disclosure of the purpose and likely effect upon Preferred Stockholders of the Reverse Stock Split, however, would not have significantly altered the "total mix" of information available to a reasonable investor, because a reasonable investor already had access to that information. The Court thus concludes that the Complaint fails to plausibly allege that the omitted information was material.

    The Proxy Statement explicitly provided that the "primary objective" of the Reverse Stock Split was "to increase the per share price of our Class A Common Stock." (ECF 56-1, at 14.) The Preferred Stock's Certificates of Designations providing the Automatic Conversion provision were publicly available, and MoneyLion's stock price at the time votes for the Proxy Statement were sought was known or reasonably available to a reasonable investor.

9

Accordingly, a reasonable investor already possessed information from which he could have concluded that a potential consequence of a Reverse Stock Split of up to 1-for-30 was the triggering of the Automatic Conversion provision. Because that information was already part of the "total mix" of information available, defendants' failure to disclose it could not have significantly altered a reasonable investor's decision. For similar reasons, the statement "the Reverse Stock Split will affect all stockholders uniformly" could not have significantly altered a reasonable investor's decision, because a reasonable investor would have known of the possibility that the Reverse Stock Split would trigger the Automatic Conversion provision. See Zappia v. Myovant Sciences Ltd., No. 23-cv-8097 (JSR), 2023 WL 8945267, at *5 (S.D.N.Y. Dec. 28, 2023) (concluding that a Proxy Statement's omission of a conflict of interest was not materially misleading in light of other public information because the "total mix of information" already included the alleged conflict of interest).

Plaintiff also alleges that defendants are liable under section 14(a) because they failed to disclose that one of their motives for the Reverse Stock Split was triggering the Preferred Stock's Automatic Conversion provision and this fact was material to a reasonable shareholder. Defendants' undisclosed motive is not material, however, because a reasonable investor would have voted no differently had the Proxy Statement disclosed that the Reverse Stock Split was also intended to trigger the Preferred Stock's Automatic Conversion provision. An investor who voted in favor of the Reverse Stock Split did so because he wanted MoneyLion's common stock price to rise; this prevented MoneyLion's Common Stock from being delisted from the NYSE and increased the Common Stock's appeal to a broader range of investors. (ECF 56-1, at 8.) An investor who intended to vote against the Reverse Stock Split did so because he did not want the Common Stock price to rise, knowing that it might trigger the

10

Automatic Conversion provision. Either way, a reasonable investor was already informed of the potential consequences of his vote, and the disclosure that the defendants intended the Reverse Stock Split to trigger the Automatic Conversion provision would not have significantly altered the total mix of information available.

II.   The Complaint Fails to Plausibly Allege a Claim Under
Section 14(a) of the Exchange Act for Lack of Transaction Causation

Plaintiffs have failed to plausibly allege a section 14(a) claim for a second and independent reason: failure to allege transaction causation. To state a claim under section 14(a) and rule 14-a-9 promulgated thereunder, plaintiff must plead both transaction causation and loss causation. Grace v. Rosenstock, 228 F.3d 40, 48 (2d Cir. 2000). Transaction causation requires plaintiff to allege that "but for the fraudulent statement or omission, the plaintiff would not have entered into the transaction." Suez Equity Investors, L.P. v. Toronto-Dominion Bank, 250 F.3d 87, 95 (2d Cir. 2001) (emphasis omitted).

Plaintiffs have failed to plausibly allege that had the Proxy Statement adequately disclosed that the Reverse Stock Split was intended to, and likely would, trigger the Preferred Stock's Automatic Conversion provision, MoneyLion's shareholders would not have approved it. At the time the Proxy Statement was solicited, the number of shares of MoneyLion's Common Stock outstanding and entitled to vote dwarfed the number of shares of Preferred Stock similarly authorized: 263,323,074 shares of Common Stock compared to 25,701,595 shares of Preferred Stock. (ECF 56-1, at 8.) The Complaint does not, and could not, allege that holders of the Preferred Stock enjoyed a majority in the proxy vote. Further, approving the Reverse Stock Split was in the interests of the holders of the Common Stock—the Reverse Stock Split

11

prevented the NYSE from delisting the Common Stock and made the Common Stock a more attractive investment vehicle for institutional investors. (ECF 56-1, at 14.) The Complaint fails to plausibly allege a reason why a holder of the Common Stock would vote down the Reverse Stock Split because of its potential consequences for a holder of the Preferred Stock. Put simply, holders of MoneyLion's Common Stock enjoyed an overwhelming majority in the proxy vote, and the Reverse Stock Split was in their interest. Even if they had been explicitly informed that the Reverse Stock Split would negatively affect the holders of the Preferred Stock, the Complaint fails to plausibly allege a reason why such a significant number of Common Stockholders would vote against their interests. For that reason, the Court concludes that plaintiffs have failed to plausibly allege that but for the fraudulent statements or omissions, MoneyLion's shareholders would not have voted in favor of the Reverse Stock Split.

III.   The Court Declines to Exercise Supplemental
       Jurisdiction Over the State-Law Claims

A district court may decline to exercise supplemental jurisdiction if it "has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). A district court has discretion as to whether it should exercise supplemental jurisdiction over state law claims when all federal claims have been dismissed. Catzin v. Thank You & Good Luck Corp., 899 F.3d 77, 83 (2d Cir. 2018). "It is well settled that where, as here, the federal claims are eliminated in the early stages of litigation, courts should generally decline to exercise pendent jurisdiction over remaining state law claims." Klein & Co. Futures, Inc. v. Board of Trade of City of New York, 464 F.3d 255, 262 (2d Cir. 2006). When deciding whether to exercise

supplemental jurisdiction over state-law claims, "district courts should balance the values of judicial economy, convenience, fairness, and comity—the 'Cohill factors.'" Id.

The Court has dismissed plaintiffs' sole federal claim. At this stage in the litigation, judicial economy will not be served by the Court retaining the state law claims. Discovery has not begun, and the Court has not yet decided any issues on the merits. In short, plaintiffs' federal claim has been eliminated "prior to the investment of significant judicial resources." Kolari v. New York-Presbyterian Hospital, 455 F.3d 118, 123 (2d Cir. 2006). The Court notes that defendants urged the Court to decline to exercise supplemental jurisdiction in their motion to dismiss (ECF 55, at 24), and plaintiffs did not oppose defendants' urging in their opposition to defendants' motion to dismiss. For these reasons, after consideration of the so-called Cohill factors, the Court declines to exercise supplemental jurisdiction over the remaining state-law claims.

CONCLUSION

Plaintiffs' claim under section 14(a) of the Exchange Act (Count I) is dismissed for failure to state a claim. The Court declines to exercise supplemental jurisdiction over the remaining claims (Counts II, III, and IV), and dismisses these claims without prejudice. The defendants' motion for oral argument (ECF 60) is denied as moot. The Clerk of Court is respectfully requested to enter judgment in favor of defendants, terminate the motion (ECF 54) and close the case.

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
May 15, 2024